Nos. 25-2152, 26-1094

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

JOSE ARNULFO GUERRERO ORELLANA,

*Petitioner-Appellee*,

v.

ANTONE MONIZ, Superintendent, Plymouth County Correctional Facility;
TODD M. LYONS, Acting Director, U.S. Immigration and Customs Enforcement;
KRISTI L. NOEM, Secretary of the U.S. Department of Homeland Security;
PAMELA BONDI, U.S. Attorney General; DAVID WESLING, Acting Field
Office Director; DAREN K. MARGOLIN, Director, Executive Office for
Immigration Review,

*Respondents-Appellants*.

On Appeal from the United States District Court
for the District of Massachusetts
No. 1:25-cv-12664 (Saris, J.)

## BRIEF OF PETITIONER-APPELLEE

Michael K.T. Tan
My Khanh Ngo
Oscar Sarabia Roman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, 7th Floor
San Francisco, CA 94104
(415) 343-0770
m.tan@aclu.org
mngo@aclu.org
osarabia@aclu.org

Jessie J. Rossman
Daniel L. McFadden
Adriana Lafaille
Julian Bava
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170

Judy Rabinovitz
Natalie Behr
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
jrabinovitz@aclu.org
IRP_NBehr@aclu.org


Gilles R. Bissonnette
SangYeob Kim
Chelsea Eddy
AMERICAN CIVIL LIBERTIES
UNION OF NEW HAMPSHIRE
18 Low Avenue
Concord, NH 03301
(603) 333-2081
gilles@aclu-nh.org
sangyeob@aclu-nh.org
chelsea@aclu-nh.org


Annelise M. Jatoba de Araujo
Annelise Araujo Law, LLC
260 Franklin Street, Suite 520
Boston, MA 02110
(617) 716-6400
annelise@anneliseᵃraujolaw.com

jrossman@aclum.org
dmcfadden@aclum.org
alafaille@aclum.org
jbava@aclum.org

Christopher E. Hart
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, MA 02210
(617) 832-1000
chart@foleyhoag.com


Carol J. Garvan
Max I. Brooks
AMERICAN CIVIL LIBERTIES
UNION OF MAINE FOUNDATION
P.O. Box 7860
Portland, ME 04112
(207) 619-8687
cgarvan@aclumaine.org
mbrooks@aclumaine.org


Sameer Ahmed
HARVARD IMMIGRATION AND
REFUGEE CLINICAL PROGRAM
Harvard Law School
6 Everett Street
Cambridge, MA 02138
(617) 384-0088
sahmed@law.harvard.edu
sardalan@law.harvard.edu

*Counsel for Petitioner-Appellee*

# **TABLE OF CONTENTS**

INTRODUCTION ...............................................................................1

STATEMENT OF THE ISSUE ..........................................................4

STATEMENT OF THE CASE ............................................................5

   I.  Historical and Statutory Framework .........................................5

      A. Pre-1996 Framework ...........................................................5

      B. IIRIRA (1996)......................................................................7

      C. Decades of Understanding...................................................10

      D. Laken Riley Act (2025) .......................................................13

      E. 2025 Reinterpretation ..........................................................14

   II. Factual and Procedural Background .........................................15

SUMMARY OF ARGUMENT..........................................................17

ARGUMENT ....................................................................................19

   I.  Title 8, § 1226 governs the detention of Petitioner and the class. .............19

      A. The text of §§ 1226 and 1225 demonstrates that § 1226 applies to noncitizens apprehended inside the United States. .............................19

         1. Section 1226's text applies to noncitizens who entered without inspection and allows their release on bond....................................19

         2. Section 1225(b)(2)'s text applies its no-bond authority only to noncitizens who are "seeking admission" at a border.....................23

      B. The history of IIRIRA demonstrates that Congress maintained § 1225(b)(2)'s application to the border and § 1226(a)'s application to the interior...........................................................................28

      C. The INA's humanitarian protections for those who entered without inspection support the conclusion that they are eligible for bond........32

      D. Settled law establishing the due process rights of noncitizens who have entered the United States, even if unlawfully, also supports the conclusion that Congress did not silently curtail the right to a bond hearing for millions of noncitizens......................................................33

i

E. Congressional acquiescence to longstanding Executive Branch interpretation confirms that Congress did not impose a detention mandate that went unnoticed for decades..............................................35

II. The government offers an implausible and unsupported account of Congress's goals and the statutory text.......................................37

A. The government's assumptions of a congressional purpose to eliminate bond for noncitizens who entered without inspection are unsupported... ...............................................................................................38

B. The government's interpretation of the text renders much of § 1226(c) ineffective and makes meaningless § 1225(b)(2)'s reference to noncitizens who are "seeking admission.".........................................41

1. The government's reading eliminates much of § 1226's application... ...............................................................................................41

2. The government's reading eliminates the "seeking admission" requirement of § 1225(b)(2). .............................................44

III. Declining to leave the United States voluntarily is not "seeking admission.".................................................................................52

CONCLUSION.................................................................................54

CERTIFICATE OF COMPLIANCE .......................................................57

CERTIFICATE OF SERVICE ..............................................................58

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.A.R.P. v. Trump*,
   605 U.S. 91 (2025)...................................................................................34

*Abramski v. United States*,
   573 U.S. 169 (2014)............................................................................28, 36

*Addington* v. Texas,
   441 U.S. 418 (1979)...............................................................................34

*Matter of Akhmedov*,
   29 I. & N. Dec. 166 (BIA 2025) ....................................................12, 35

*Bankamerica Corp. v. United States*,
   462 U.S. 122 (1983)...............................................................................36

*Biden v. Texas*,
   597 U.S. 785 (2022)...............................................................................28

*Brito v. Barr*,
   395 F. Supp. 3d 135 (D. Mass. 2019) .................................................12

*Brito v. Garland*,
   22 F.4th 240 (1st Cir. 2021)...............................................................12

*Buenrostro-Mendez v. Bondi*,
   No. 25-20496, 166 F.4th 494, 2026 WL 323330 (5th Cir. Feb. 6,
   2026) ..........................................................................................4, 36, 39

*Castañon-Nava v. U.S. Dep't of Homeland Sec.*,
   161 F.4th 1048 (7th Cir. 2025) .................................................*passim*

*Matter of Castillo-Padilla*,
   25 I. & N. Dec. 257 (BIA 2010) .................................................12, 35

*Chisom v. Roemer*,
   501 U.S. 380 (1991)...............................................................................31

*Clark v. Martinez*,
    543 U.S. 371 (2005)...........................................................................42

*Conservation Law Foundation, Inc. v. Pruitt*,
    881 F.3d 24 (1st Cir. 2018)..............................................................37

*Matter of D-J-*,
    23 I. & N. Dec. 572 (A.G. 2003) ................................................12, 35

*Demore v. Kim*,
    538 U.S. 510 (2003)....................................................................34, 43

*Dep't of Homeland Sec. v. Thuraissigiam*,
    591 U.S. 103 (2020).......................................................................6, 39

*Doe v. Moniz*,
    800 F. Supp. 3d 203 (D. Mass. 2025)..............................................22

*Fischer v. United States*,
    603 U.S. 480 (2024).........................................................................49

*Foucha v. Louisiana*,
    504 U.S. 71 (1992)...........................................................................34

*Goodyear Atomic Corp. v. Miller*,
    486 U.S. 174 (1988).........................................................................21

*Guerrero Orellana v. Moniz*,
    Nos. 25-2152, 26-1094, U.S. Court of Appeals, 1st Cir.,  Order,
    (1st Cir. Feb. 2, 2026) ......................................................................16

*Helbrum v. Williams Olson*,
    No. 4:25-CV-00349-SHL-SBJ, 2025 WL 2840273 (S.D. Iowa
    Sept. 30, 2025) ................................................................................22

*Hernandez Lara v. Lyons*,
    10 F.4th 19 (1st Cir. 2021)...............................................................12

*Ibragimov v. Gonzales*,
    476 F.3d 125 (2d Cir. 2007) ............................................................49

*INS v. St. Cyr*,
    533 U.S. 289 (2001).........................................................................35

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018)......................................................................13, 42

*Kansas v. Hendricks*,
    521 U.S. 346 (1997)..............................................................................34

*Kaplan v. Tod*,
    267 U.S. 228 (1925)..............................................................................40

*King v. Burwell*,
    576 U.S. 473 (2015)..............................................................................42

*Landon v. Plascencia*,
    459 U.S. 21 (1982)..................................................................................7

*Learning Res., Inc. v. Trump*,
    __ S. Ct. __, 2026 WL 477534 (U.S. Feb. 20, 2026) ...................31, 36

*Matter of Lemus-Losa*,
    25 I & N. Dec. 734 (BIA 2012) ............................................................50

*Leng May Ma v. Barber*,
    357 U.S. 185 (1958)..............................................................................40

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)........................................................................36, 50

*Luna Perez v. Sturgis Public Schs.*,
    598 U.S. 142 (2023)........................................................................32, 39

*Maldonado Bautista v. Santacruz Jr.*,
    __ F. Supp.3d __, 2026 WL 468284 (C.D. Cal. Feb. 18, 2026).........14

*Maracich v. Spears*,
    570 U.S. 48 (2013)................................................................................28

*Mejia-Orellana v. Gonzales*,
    502 F.3d 13 (1st Cir. 2007)...................................................................54

*Monsalvo Velazquez v. Bondi*,
    604 U.S. 712 (2025)..............................................................................22

*Narragansett Indian Tribe v. Rhode Island*,
  449 F.3d 16 (1st Cir. 2006) (en banc)..........................................23, 41

*Nielsen v. Preap*,
  586 U.S. 392 (2018).........................................................11, 20, 43

*Ojeda Montoya v. Joyce*,
  No. 2:25-CV-00558-SDN, 2025 WL 3557777 (D. Me. Nov. 17,
  2025) ...................................................................................22

*Pereira v. Sessions*,
  585 U.S. 198 (2018)...............................................................22

*Sanchez v. Mayorkas*,
  593 U.S. 409 (2021)...............................................................53

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010)...............................................................21

*Shaughnessy v. United States ex rel. Mezei*,
  345 U.S. 206 (1953).....................................................*passimMezei*,
  345 U.S. 206 (1953)................................................................*5*

*Taggart v. Lorenzen*,
  587 U.S. 554 (2019)...............................................................30

*Tax-Free Fixed Income Fund v. Ocean Capital*,
  137 F.4th 6 (1st Cir. 2025)......................................................17

*Torres v. Barr*,
  976 F.3d 918 (9th Cir. 2020) ..............................................47, 51

*United States v. Salerno*,
  481 U.S. 739 (1987)...............................................................34

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
  599 U.S. 419 (2023)...............................................................47

*Util. Air Regul. Grp. v. E.P.A.*,
  573 U.S. 302 (2014).................................................................3

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ..........................................................21, 32

*Wong Wing v. United States*,
   163 U.S. 228 (1896) ....................................................................... 5

*Woodby v. INS*,
   385 U.S. 276 (1966) ....................................................................... 7

*Matter of Y-N-P-*,
   26 I. & N. Dec. 10 (BIA 2012) .................................................... 53

*Matter of Yajure Hurtado*,
   29 I. & N. Dec. 216 (BIA 2025) ........................................ 2, 14, 15

*Yamataya v. Fisher*,
   189 U.S. 86 (1903) ......................................................................... 6

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ................................................................ 33, 40

*Zemel v. Rusk*,
   381 U.S. 1 (1965) ......................................................................... 36

**Statutes**

8 U.S.C. § 1101(a) ......................................................................... *passim*

8 U.S.C. § 1153(c) ................................................................................ 48

8 U.S.C. § 1154(a)(1)(K) ..................................................................... 33

8 U.S.C. § 1182 .............................................................................. *passim*

8 U.S.C. § 1225 .............................................................................. *passim*

8 U.S.C. § 1226 ............................................................................. *passim*

8 U.S.C. § 1227(a) ................................................................................. 8

8 U.S.C. § 1229a ........................................................................... *passim*

8 U.S.C. § 1229b(b)(1) ......................................................................... 54

8 U.S.C. § 1229c(a)(4) .......................................................................... 52

8 U.S.C. § 1231(b)(3)(A) ...................................................................... 54

8 U.S.C. § 1251(a)  ....................................................................................7

8 U.S.C. § 1252.....................................................................6, 7, 20, 29

8 U.S.C. § 1254a(c)(2)(A) ...................................................................33

8 U.S.C. § 1255 ..............................................................................32, 33

8 U.S.C. § 1357......................................................................................26

8 U.S.C. § 1503(c) .................................................................................26

8 U.S.C. § 1736......................................................................................25

Administrative Procedure Act................................................................17

Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 ........37

Illegal Immigration Reform and Immigrant Responsibility Act, Pub.
    L. 104–208, 110 Stat. 3009 (1996) ...............................................*passim*

Immigration and Nationality Act (INA) ...........................................*passim*

Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025) ........................13

REAL ID Act of 2005, Pub. L. 109.13, 119 Stat. 231 ...........................37

USA PATRIOT Act of 2001, Pub. L. 107-56, 115 Stat. 272 ..................37

**Rules**

8 C.F.R. § 208.16(c)(4) ..........................................................................53

8 C.F.R. § 208.17(a)...............................................................................53

8 C.F.R. § 235.3(b)(1)(ii) ..................................................................35, 36

8 C.F.R. § 235.3(c)(1)........................................................................36, 43

8 C.F.R. § 236.1(c)(5) ............................................................................10

8 C.F.R. § 236.21(c)(1)...........................................................................53

8 C.F.R. § 287.3(b) .................................................................................26

8 C.F.R. § 1003.19(a) ............................................................11

8 C.F.R. § 1003.19(h)(2) ...................................................11, 54

8 C.F.R. § 1236.1(d) .........................................................11, 20

**Legislative Authorities**

104 Cong. Rec. S4599-4600 (daily ed. May 2, 1996) .............................44

H.R. Rep. No. 103-395 ........................................................33

H.R. Rep. No. 104-469, pt. 1 ............................................*passim*

H.R. Rep. No. 104-828 ...................................................*passim*

H.R. Rep. No. 106-939 (2000) .................................................33

S. Rep. No. 104-48 (1995) ....................................................44

S. Rep. No. 104-249 (1996) ...................................................44

H.R. Rep. No. 106–939 (2000) .................................................33

**Other Authorities**

Inspection and Expedited Removal of Aliens; Detention and Removal
    of Aliens; Conduct of Removal Proceedings; Asylum Procedures,
    62 Fed. Reg. 10,312 (Mar. 6, 1997) ...............................11, 12, 36

Doris Meissner, Comm'r, INS to Henry J. Hyde, Chairman, Comm.
    on the Judiciary, U.S. House of Representatives, Letter Invoking
    IIRIRA Transitional Period Custody Rules (Oct. 3, 1997),
    https://perma.cc/HFF9-MY3N ..........................................31

Jill Wilson, et al., Cong. Rsch. Serv., R47848, *Nonimmigrant
    Overstays: Overview and Policy Issues* (2023) ........................31

Kyle Cheney, *Our running list of judges who have ruled on ICE's
    mass detention policy,* Politico (Feb. 18, 2026),
    https://www.politico.com/news/2026/02/18/trump-judges-
    immigration-detention-00784614 ......................................4

Oxford Encyclopedic English Dictionary 729 (3d ed. 1996) ..................25

U.S. Immig. & Customs Enforcement, *Interim Guidance Regarding
   Detention Authority for Applicants for Admission* (July 8, 2025),
   https://perma.cc/SNA2-XNSZ...............................................................................14

Webster's Third New International Dictionary 2055 (1993) ..................................25

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

This appeal concerns the Executive Branch's new interpretation of the immigration statutes to mandate detention without bond for noncitizens who entered the United States without inspection—a policy that has led to the unlawful detention of countless noncitizens. Specifically, the Court must determine whether a noncitizen arrested in the United States after entering the country without inspection is subject to bond-eligible detention under 8 U.S.C. § 1226 or to no-bond detention under 8 U.S.C. § 1225(b)(2). Both parties agree that oral argument is appropriate under Federal Rule of Appellate Procedure 34(a)(2) and 1st Circuit Local Rule 34.0(a) to assist the Court in evaluating the parties' arguments with respect to this important question.

**INTRODUCTION**

The government contends that Congress has ordered it to detain millions of people inside the United States and deprive them of their liberty without any opportunity for release on bond. The government further contends that Congress's command was so subtle and opaque that *the entire federal government* (including the first Trump Administration) failed to recognize it for nearly 30 years, until the Department of Homeland Security ("DHS") and the Board of Immigration Appeals ("BIA") issued new policies in mid-2025. As a result of these new policies, people who live in the United States, who have no criminal record, who are not dangerous, who present no risk of flight, and who may well win their immigration cases are now being jailed every day with no hearing where they can seek release. Even people with strong claims to humanitarian protection and forms of lawful status are now under extraordinary pressure to accept deportation because the price of fighting a case in Immigration Court is months or years in jail.

Petitioner-Appellee José Arnulfo Guerrero Orellana ("Petitioner") experienced this new policy firsthand.  He has resided in the United States for more than a decade. He built a life in Massachusetts with his family, including his one-year-old U.S. citizen daughter. He has no criminal record. In September 2025, the government arrested him during a vehicle stop in Massachusetts and placed him in removal proceedings. The law Congress enacted and decades of Executive practice

1

dictate that noncitizens who are already present in the country—like Petitioner and the class he represents ("Petitioners")—are detained, if at all, under 8 U.S.C. § 1226(a). Section 1226(a) detainees must receive a bond hearing upon request, which may result in release on bond and/or conditions during the pendency of their immigration proceedings.

The immigration courts abandoned that longstanding framework last September, when the BIA issued a new precedential decision called *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (B.I.A. 2025). Under that decision, the government now contends any person who originally entered the country without inspection must be detained with no access to a bond hearing. The government relies on the authority of 8 U.S.C. § 1225(b)(2), even though that statute applies only to noncitizens at the border who are "seeking admission" into the United States. The District Court (Saris, J.) rejected the government's position that a noncitizen arrested in the interior of the United States was "seeking admission" and entered a preliminary injunction requiring a bond hearing for Petitioner. The Immigration Court ordered Petitioner's release on a $3,500 bond. The District Court subsequently entered a final declaratory judgment for Petitioners.

The District Court was correct. The government's new detention rule flies in the face of the statutory text, context, and history. When Congress enacted the current detention statutes in 1996, it expressly maintained in § 1226(a) the prior

2

longstanding scheme that provided for possible release on bond for noncitizens arrested inside the United States, including those who entered without inspection. Following enactment of the 1996 legislation and consistent with Congress's stated intent, the Executive promulgated contemporaneous regulations providing bond hearings before immigration judges, who determine if these noncitizens pose a danger or flight risk. Five different presidential administrations, both Democratic and Republican, faithfully applied the statutes in this manner. And when Congress amended the detention statutes just last year, it reaffirmed that Petitioners are within the scope of § 1226. Indeed, it would be extraordinary if Congress had done otherwise, given the Supreme Court's longstanding case law that domestic civil detention for *any purpose* requires strong due process protections.

"When an agency claims to discover in a long-extant statute an unheralded power . . . [the courts] typically greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014). Here, more than a "measure" is warranted, given the breathtaking consequences of the government's reversal. If accepted, the government's new interpretation would require the detention of *millions* of people inside the United States without due process—regardless of whether they present a danger or flight risk; how long they have lived here; or the devastating effect such detention will have on them, their families, and the community. That would be the largest expansion of mandatory

3

detention in U.S. history. The text, context, and history show that so extraordinary a statutory command did not simply escape the notice of Congress and five different administrations for nearly three decades. Instead, it does not exist.

The court below and the overwhelming majority of district courts across the country have agreed: the government's new detention rule is contrary to law, and the government is intentionally misclassifying bond-eligible § 1226(a) detainees as bond-ineligible § 1225(b)(2) detainees.[1] The Seventh Circuit has preliminarily concluded the same. *See Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048, 1060–63 (7th Cir. 2025) (granting and denying stay motion in part). Although a divided panel of the Fifth Circuit recently adopted the government's position, *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 498 (5th Cir. 2026), the dissent forcefully explains how that position distorts the statutory text, context and history. *Id*. at 508-521 (Douglas, J., dissenting). This Court should reject the government's attempt to rewrite the law, and affirm the District Court.

## STATEMENT OF THE ISSUE

Reversing 30 years of Executive practice and interpretation, DHS determined that Petitioners—people arrested inside the United States and alleged to have entered

---

[1] More than 390 judges have rejected the government's position, including every judge to have considered the issue in the District of Massachusetts. *See* Kyle Cheney, *Our running list of judges who have ruled on ICE's mass detention policy*, Politico (updated Feb. 27, 2026), www.politico.com/news/2026/02/18/trump-judges-immigration-detention-00784614; Petitioner's Addendum at PA15–17.

the country without inspection—are subject to 8 U.S.C. § 1225(b)(2), a statute mandating detention without bond for noncitizens who are "seeking admission" to the United States. This case raises the question whether the District Court correctly determined that Petitioners' detention is instead governed by the interior detention provisions of 8 U.S.C. § 1226(a), which allow for release on bond.

## STATEMENT OF THE CASE

### I.    Historical and Statutory Framework

The immigration system has long treated noncitizens inside the United States differently from those at the border, consistent with the settled understanding that those inside the United States—even if they entered unlawfully—have weighty due process rights. Congress legislated against that backdrop in amending the immigration laws in 1996.

### A.    Pre-1996 Framework

Long before 1996, it was well-established that noncitizens inside the United States are entitled to due process even if they entered without permission. *See Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law"); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (concluding "that all persons within the territory of the United States are entitled to the protection

5

guarantied" by the Due Process Clause); *Yamataya v. Fisher*, 189 U.S. 86, 100–01 (1903) (affirming that when a noncitizen "has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here," due process rights attach—rights ensuring that "no person shall be deprived of his liberty without opportunity, at some time, to be heard, before such officers, in respect of the matters upon which that liberty depends").

The Supreme Court had recognized, however, that noncitizens who are at the border, seeking to come in, stand on "different footing." *Mezei*, 345 U.S. at 212. Thus, even when technically on U.S. soil at ports of entry, a noncitizen on the threshold of entry does not enjoy the same due process protections that attach to noncitizens who have entered the United States. *Id.*; *see also Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139–40 (2020) (noncitizen apprehended "on the threshold" within 25 yards of the border had not effected an entry and therefore had "only those rights regarding admission that Congress has provided by statute").

Consistent with the distinct constitutional status accorded to people who have entered the United States, the pre-1996 regime provided a right to "deportation proceedings" both for noncitizens who entered without inspection ("EWI noncitizens") and to noncitizens who had entered lawfully. *See* 8 U.S.C. §§ 1251(a), 1252(b) (1995). Noncitizens whom the government alleged to be deportable received certain procedural and substantive rights in proceedings in which the

6

government bore the burden of proof. *See Landon v. Plasencia*, 459 U.S. 21, 25–27 (1982); *Woodby v. INS*, 385 U.S. 276 (1966).

On the other hand, "exclusion proceedings" were provided to people encountered at the border during the inspection process but who had not yet "enter[ed]" the country. *See* 8 U.S.C. §§ 1225(a)–(b) (1995), 1226(a) (1995). Noncitizens in exclusion proceedings bore the burden of proving admissibility, enjoyed fewer procedural protections, and were eligible for fewer forms of relief. *See Plasencia*, 459 U.S. at 26, 35–36.

Regarding detention, separate statutes governed the detention of those inside the United States and those at the border. Noncitizens "[p]ending a determination of deportability," including EWI noncitizens, could be released on bond. *See* 8 U.S.C. § 1252(a)(1) (1995). But noncitizens in exclusion proceedings could not have bond hearings. *Id*. § 1225(b) (1995).

**B.     IIRIRA (1996)**

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. 104–208, 110 Stat. 3009 (1996), making significant changes to the immigration system.

Regarding *removal*, Congress aligned the removability grounds and procedures for EWI noncitizens with those applicable to people who stand at the threshold of entry. Legislative history indicates that Congress "intended to replace

7

certain aspects of the current 'entry doctrine,' under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry." H.R. Rep. No. 104–469, at 225 (1996).

IIRIRA eliminated separate deportation and exclusion proceedings, combining them into a single "removal" proceeding for both those who had effected entry into the United States and those stopped at the border. *See* IIRIRA § 304, 110 Stat. 3009–587 to 3009–593; *see also* 8 U.S.C. § 1229a. IIRIRA then made the applicable grounds of removal (*i.e.*, deportability or inadmissibility) depend *not* on physical entry into the United States, but instead on the fact of an "admission," newly defined as a "lawful entry" after inspection by an immigration officer. 8 U.S.C. § 1101(a)(13)(A). Under the new scheme, a noncitizen who has been "admitted" to the country is subject to grounds of "deportability," *see id*. § 1227(a), whereas a person who entered the country without inspection and has *not* been admitted or paroled is subject to grounds of "inadmissibility," *see id*. § 1182(a). Thus, EWI noncitizens are no longer "deportable" but instead "inadmissible."

As part of these reforms, Congress deemed as "applicant[s] for admission" noncitizens who are "present in the United States [without having] been admitted" as well as noncitizens who "arrive[] in the United States" either at or outside a "designated port of arrival." *Id*. § 1225(a)(1). By doing so, Congress placed the

8

burden on EWI noncitizens to show that they are "clearly and beyond doubt entitled to be admitted and [are] not inadmissible" in their removal proceedings. 8 U.S.C. § 1229a(c)(2)(A).

Regarding detention, Congress amended the statute that generally makes available bond hearings for people inside the United States, now codified at 8 U.S.C. § 1226, by expanding the exceptions in that statute to prohibit release on bond for categories of inadmissible and deportable noncitizens with certain criminal convictions. 8 U.S.C. § 1226(c); IIRIRA §§ 303(a), 321, 110 Stat. 3009–585, 3009–627 to 3009–628. These exceptions, enumerated in § 1226(c), now included mandatory detention for all EWI noncitizens who were subject to any crime-based inadmissibility ground. 8 U.S.C. §§ 1226(c)(1)(A); 1182(a)(2).

Congress acknowledged the significant increase in detention that would result from the expansion of mandatory detention under § 1226(c). *See* H.R. Rep. No. 104–469, pt. 1, at 120, 123, 207. Accordingly, Congress included in IIRIRA an option to delay the provision's implementation for up to two years to allow the government to increase its detention capacity. IIRIRA § 386(a), 110 Stat. 3009–653.

Separately, Congress retained the prior practice of detaining, without the possibility of bond, individuals who are taken into custody at the border and are determined to be inadmissible. *See* 8 U.S.C. § 1225(b). Section 1225(b)(1) imposes mandatory detention on certain "arriving" noncitizens and other recent entrants who

are subject to newly created expedited removal proceedings. *Id*. § 1225(b)(1)(A)(i).

Section 1225(b)(2)—the provision the government relies on in this case—applies to

"other" applicants for admission who are not subject to expedited removal, *see id*.

§ 1225(b)(2)(B)(ii), and who are "seeking admission" to the country, *See id*.

§ 1225(b)(2)(A).

Noncitizens subject to detention under § 1225(b) have no access to bond

hearings. Instead, the only option for release is through a discretionary grant of

parole. *See* 8 U.S.C. § 1182(d)(5)(C) (authorizing parole "for urgent humanitarian

reasons or a significant public benefit").

Unlike the expanded detention mandate enacted at § 1226(c), Congress did

not indicate in IIRIRA that the detention mandated by either § 1225(b)(1) or

§ 1225(b)(2) warranted any delay in implementation.

## C.    Decades of Understanding

From IIRIRA's enactment in 1996 until mid-2025, the Executive Branch

consistently acknowledged that § 1226 governs the detention of EWI noncitizens

and affords them the opportunity to seek release. Contemporaneously with IIRIRA's

enactment, the Executive Branch issued regulations in March 1997 confirming that

noncitizens arrested inside the country and placed into removal proceedings are

eligible for release on bond under § 1226(a) (unless § 1226(c) applies). *See* 8 C.F.R.

§§ 1003.19(a) & (h)(2), 1236.1(d). Pursuant to these regulations, noncitizens "may

seek review of [their] detention by an officer at [DHS] and then by an immigration judge," and may "secure [their] release" on bond after evaluation of flight risk and danger to the community. *Nielsen v. Preap*, 586 U.S. 392, 397–98 (2019) (citing 8 C.F.R. §§ 1003.19, 1236.1(d)). The regulations further specify who is *not* eligible for bond—primarily "arriving aliens" and noncitizens subject to § 1226(c)(1). Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312, 10,323, 10,361 (Mar. 6, 1997); *see also* 8 C.F.R. §§ 236.1(c)(5), 1003.19(h)(2).

In promulgating the March 1997 rule, the Department of Justice ("DOJ") explained that:

- "Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination;"

- "[I]nadmissible aliens, except for arriving aliens, have available to them bond redetermination hearings before an immigration judge;" and

- "This procedure maintains the status quo regarding release decisions for aliens in proceedings . . . ."

62 Fed. Reg. at 10,323.

These regulations have remained essentially unchanged and have been consistently applied for three decades. Likewise, the Executive Branch—including

the first Trump administration—has, until now, consistently interpreted § 1226 to apply to EWI noncitizens. *See* Opening Brief ("O.B.") 15–16; *see also*, *e.g.*, *Matter of D-J-*, 23 I. & N. Dec. 572, 579 (A.G. 2003) (Attorney General "exercising [his] authority under section [1226]" to deny release on bond to Haitian noncitizen who had evaded inspection); *Matter of Castillo-Padilla*, 25 I. & N. Dec. 257, 262 (B.I.A. 2010) (observing EWI noncitizen was released under § 1226); *Matter of Akhmedov*, 29 I. & N. Dec. 166, 166 (B.I.A. 2025) (stating, as of June 30, 2025, in the case of noncitizen who entered without inspection, "[t]he respondent's custody determination is governed by the provisions of section [1226]").

This longstanding interpretation is reflected in the decisions of this Court, as well. *See, e.g.*, *Hernandez-Lara v. Lyons*, 10 F.4th 19, 23–24 (1st Cir. 2021) (holding noncitizen who "entered the United States in 2013 without being admitted or paroled" and who was detained under § 1226(a) was entitled to bond hearing with strong procedural protections); *Brito v. Garland*, 22 F.4th 240, 245 (1st Cir. 2021) (noncitizens arrested within United States entitled as a class to § 1226(a) bond hearings with strong procedural protections).[2]

The Supreme Court has similarly recognized the scope of these two detention statutes. It described § 1225 as operating "at the Nation's borders and ports of entry,

---

[2] Two of the three class representatives in *Brito* had entered without inspection, and the certified classes included such persons. *See Brito v. Barr*, 395 F. Supp. 3d 135, 140–41 (D. Mass. 2019).

where the Government must determine whether [a noncitizen] seeking to enter the country is admissible." *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018). And the Court described § 1226 as the detention authority for noncitizens who are "already in the country." *Id.* at 289; *see also Castañon-Nava*, 161 F.4th at 1061 (observing distinction made in *Jennings* between statutes applicable to noncitizens "*seeking admission*" versus those "*already in the country*"). Indeed, the government itself in *Jennings* described § 1226 as governing the detention of noncitizens "who are already inside the United States," while describing § 1225(b) as "the most recent iteration of a statutory framework that, for a century, has provided for the exclusion of inadmissible aliens arriving at the Nation's borders," Petitioners' Brief, *Jennings v. Rodriguez*, 583 U.S. 281 (2018) (No. 15–1204), 2016 WL 5404637 at *4, 19.

### D.    Laken Riley Act (2025)

Consistent with the longstanding acknowledgement that § 1226 applies to EWI noncitizens, the Laken Riley Act ("LRA"), Pub. L. No. 119–1, 139 Stat. 3 (2025), enacted last year, amended § 1226(c) to exempt another group from § 1226(a) bond eligibility. Under the LRA, individuals who are charged with inadmissibility under, *inter alia*, § 1182(a)(6)(A), for being present without being admitted or paroled, and who are additionally accused or convicted of specified criminal conduct, are also subject to mandatory detention within § 1226. *See*

13

8 U.S.C. § 1226(c)(1)(E). The LRA reflects Congress's continuing understanding that EWI noncitizens fall within the scope of § 1226, not § 1225(b)(2). O.B. 45.

### E.    2025 Reinterpretation

On July 8, 2025, DHS adopted a novel interpretation of the detention statutes. Breaking with decades of prior understanding, DHS "determined," in unpublished guidance, "that section [1225] of the Immigration and Nationality Act (INA) rather than section [1226], is the applicable immigration detention authority for all applicants for admission," including anyone who entered without inspection. *See* U.S. Immigr. & Customs Enf't, *Interim Guidance Regarding Detention Authority for Applicants for Admission* (July 8, 2025), https://perma.cc/SNA2-XNSZ; O.B. 16. DHS instructed Immigration and Customs Enforcement to subject any noncitizen present in the United States without being admitted or paroled to mandatory detention under § 1225(b)(2), explaining that these "applicant[s] for admission" would now be "treated in the same manner that 'arriving aliens' have historically been treated." *Id.*

Months later, the BIA adopted that interpretation in a published decision, *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (B.I.A. 2025).[3] The BIA held that

---

[3] The Central District of California vacated *Yajure Hurtado* on a nationwide basis, but that order was later stayed on appeal. *See Maldonado Bautista v. Santacruz*, __ F. Supp. 3d __, 2026 WL 468284, at *12 (C.D. Cal. Feb. 18, 2026), stayed by Order, 26-1044 (Mar. 6, 2026).

noncitizens arrested inside the country and charged with inadmissibility are now subject to mandatory detention under § 1225(b)(2) and not bond eligible under § 1226. *Id*. at 219, 228. As a result, the government is applying § 1225(b)(2) not only at the border, but also to EWI noncitizens apprehended anywhere in the United States, and is refusing to afford such noncitizens bond hearings or any possibility of release under § 1226.

## II.    Factual and Procedural Background

José Arnulfo Guerrero Orellana is a Salvadoran national who came to the United States in 2013. App'x 133, 139. On September 18, 2025, immigration officials arrested him during a vehicle stop in Everett, Massachusetts. App'x 134. The government charged him in civil immigration proceedings with being present in the United States without admission or parole under 8 U.S.C. § 1182(a)(6)(A)(i) and not possessing a valid entry document under § 1182(a)(7)(A)(i)(I). *Id.* He was consequently in the category of people stripped of bond hearing access by *Yajure Hurtado*.

On September 18, 2025, Mr. Guerrero Orellana filed a habeas petition. App'x 007. He subsequently filed an amended complaint and petition raising his individual

claims, as well as claims on behalf of a class of noncitizens detained in, or in the jurisdiction of an immigration court in, Massachusetts. App'x 008.

On October 3, 2025, the District Court issued a preliminary injunction on behalf of Mr. Guerrero Orellana, ordering his release unless the government gave him a bond hearing. A001–030. On October 9, 2025, an immigration judge granted him bond and he was released the next day. App'x 087–092. The government appealed the District Court's preliminary injunction.

On October 30, 2025, the District Court certified a class on Count I of the complaint, which raised the statutory question concerning the proper detention authority for EWI noncitizens. A031–068. On December 19, 2025, the District Court entered partial summary judgment for Petitioners on Count I; held that the class members were eligible for bond under § 1226(a); issued a class-wide declaratory judgment; directed notice to the class; and entered its order as an appealable partial final judgment. A069–105. The District Court subsequently modified its class notice orders. App'x 159. The government appealed the class-wide summary judgment order. App'x 160.

This Court consolidated the appeals of Mr. Guerrero Orellana's individual preliminary injunction and the class-wide declaratory judgment. Order, *Guerrero Orellana v. Moniz*, Nos. 25–2152, 26–1094 (1st Cir. Feb. 2, 2026). The government presents no developed arguments challenging class certification or the scope of relief

and mentions these issues only in a footnote. *See* O.B. 51 n.5. Any such arguments are therefore waived, *see, e.g.*, *Tax-Free Fixed Income Fund for P.R. Residents, Inc. v. Ocean Cap. LLC*, 137 F.4th 6, 24 (1st Cir. 2025), and the sole issue before the Court is the statutory interpretation question addressed by the District Court's preliminary injunction and final declaration.[4]

## SUMMARY OF ARGUMENT

I.     The statutory text, context, and history all demonstrate that the detention of EWI noncitizens is governed by § 1226.

I.A.     The text shows that Congress applied § 1226 to EWI noncitizens. In § 1226, Congress created explicit exceptions to bond eligibility for EWI noncitizens who committed crimes, exceptions that would be unnecessary if EWI noncitizens were subject to no-bond detention under § 1225(b)(2). Meanwhile, Congress applied § 1225(b)(2) only to noncitizens who are "seeking admission."

I.B.     This history of IIRIRA shows that Congress intended to maintain the scope of its interior detention statute, § 1226, and modified that statute to ensure that it would include EWI noncitizens that IIRIRA had now classified as inadmissible. Moreover, in expanding mandatory detention under § 1226(c), Congress allowed for delayed implementation in light of bed space concerns, a fact that supports the

---

[4] The District Court reserved judgment on claims under the Administrative Procedure Act and U.S. Constitution, which remain pending below.

17

conclusion that Congress did not intend to create a much larger no-bond detention mandate under § 1225(b)(2).

I.C.    The INA's inclusion of humanitarian protections for EWI noncitizens who are victims of crimes supports interpreting the INA not to require the categorical detention of EWI noncitizens without bond.

I.D.    Long-established due process protections for noncitizens who have entered the United States, even if unlawfully, also counsel against assuming Congress intended in 1996 to curtail bond hearings for EWI noncitizens.

I.E.    Congressional acquiescence to 30 years of consistent interpretation by the executive branch demonstrates that interpreting § 1226 to apply to EWI noncitizens is consistent with Congressional intent.

II.    The government's arguments distort Congress's intent and the statutory text.

II.A.    The government's assumption that Congress wanted to take the constitutionally suspect step of eliminating bond entirely for EWI noncitizens, simply because it modified aspects of the entry doctrine, is unsupported.

II.B.    The government's statutory construction creates numerous problems that it cannot resolve. To attempt to get around the wholesale nullification of statutory subparagraphs within § 1226(c) that its interpretation creates, the government implausibly posits that Congress included EWI noncitizens in § 1226(c)

only for the purpose of altering rules about parole. Regarding § 1225(b)(2), the government's interpretation renders "seeking admission" superfluous, and its attempts to show that all "applicants for admission" are "seeking admission" fail.

## ARGUMENT

### I.    Title 8, § 1226 governs the detention of Petitioner and the class.

Text, context, and history show that Congress in 1996 did not extend the no-bond border authority of 8 U.S.C. § 1225(b)(2) to millions of people inside the United States who originally entered without inspection. Instead, legislating under an established understanding that EWI noncitizens have due process rights, Congress preserved their bond eligibility under the interior detention statute, 8 U.S.C. § 1226.

### A.    The text of §§ 1226 and 1225 demonstrates that § 1226 applies to noncitizens apprehended inside the United States.

The statutory text demonstrates that Congress applied § 1226(a) to noncitizens apprehended inside the United States and applied § 1225(b)(2) to noncitizens who are seeking admission at the border.

#### 1.    Section 1226's text applies to noncitizens who entered without inspection and allows their release on bond.

Section 1226 authorizes the arrest and detention of noncitizens "pending a decision on whether the [noncitizen] is to be removed from the United States."

19

8 U.S.C. § 1226(a). The text of its two key provisions—one allowing for release, and one articulating exceptions—shows that both apply to EWI noncitizens.

Section 1226(a) permits releasing a noncitizen "on bond" or other conditions during removal proceedings. Noncitizens subject to § 1226(a) may seek that release in a bond hearing in front of an immigration judge. 8 C.F.R. §§ 1003.19, 1236.1(d)(1). The provision contains no exception based on the circumstances of a noncitizen's entry into the country and, instead, applies to noncitizens who are "arrested" and placed in removal proceedings—*i.e.*, § 1226(a) applies both to noncitizens who have not been admitted, and are charged under "inadmissibility" grounds, *see* 8 U.S.C. § 1182, and to noncitizens who were previously admitted and are charged under "deportability" grounds, *see* 8 U.S.C. § 1229a(a)(1),(2), (c)(2)(A), (e)(2)(A). *See* 8 U.S.C. § 1226(a).

The provisions of § 1226(a) that allow for release apply "[e]xcept as provided in subsection (c)." In turn, § 1226(c) requires detention during proceedings for noncitizens on certain criminal grounds. Tellingly, since IIRIRA, § 1226(c) has enumerated specific deportability *and inadmissibility* grounds that trigger mandatory detention, confirming § 1226's application to EWI noncitizens, who are subject to inadmissibility grounds. *See* 8 U.S.C. § 1226(c)(1)(A), (c)(1)(D), (c)(1)(E), (c)(4); *Preap*, 586 U.S. at 397, 409; Pub. L. No.104–208, 110 Stat. 3009, § 303(a) (1996); *cf.* 8 U.S.C. § 1252(a)(2) (1996).

Because § 1226(c) is an exception to bond eligibility under § 1226(a), the inclusion of categories of EWI noncitizens in § 1226(c) confirms that EWI noncitizens fall under the umbrella of § 1226 and are generally bond eligible under § 1226(a). Section 1226(c) is thus the exception that confirms the rule: § 1226(a) generally affords bond to inadmissible noncitizens—including those, like Petitioners, who are alleged to have entered the country without inspection—*unless* the exception in § 1226(c) applies. If § 1226(a) did not generally provide bond to inadmissible noncitizens, Congress would have had no need to exclude a subset of them from bond eligibility under § 1226(a) in the first place. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393, 400 (2010) (the fact that Congress has created specific exceptions "proves" that the statute applies in general).

Congress reinforced this point just last year when it expanded § 1226(c) through the LRA. The LRA moves certain additional categories of people from § 1226(a) to § 1226(c). It specifically targets people, like Petitioners, who entered the country without inspection if they, unlike Petitioners, are also charged with, arrested for, convicted of, or admit to committing certain newly-added crimes. *See* 8 U.S.C. § 1226(c)(1)(E) (requiring the detention of, *inter alia*, those "present without admission or parole" under § 1182(a)(6)(A), if they are charged with certain crimes). Congress is presumed to be "knowledgeable about existing law pertinent to the legislation it enacts," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 185

(1988), and the LRA thus makes clear Congress's understanding and intent that EWI noncitizens fall under the umbrella of § 1226. Otherwise, there would have been no need for Congress to exclude a subset of EWI noncitizens from § 1226(a) bond eligibility.

Indeed, applying § 1225(b)(2) rather than § 1226 to EWI noncitizens would *undermine* the LRA. Were the government correct that § 1225(b)(2) governs the detention of EWI noncitizens, those noncitizens would become eligible for release on parole under § 1182(d)(5) at the agency's discretion—*even if* they are accused of or committed the LRA's predicate crimes. But Congress enacted the LRA precisely to require such noncitizens' detention. *See Pereira v. Sessions*, 585 U.S. 198, 212 (2018) (courts should not "impute to Congress such a contradictory and absurd purpose, particularly where doing so has no basis in the statutory text." (cleaned up)); *Monsalvo Velazquez v. Bondi*, 604 U.S. 712, 725 (2025) ("When Congress adopts a new law against the backdrop of a 'longstanding administrative construction,'" courts "generally presume[] the new provision should be understood to work in harmony with what has come before.").[5]

---

[5] Courts have agreed that petitioners challenging their detention under the LRA are not subject to § 1225(b)(2) but rather § 1226. *See, e.g.*, *Doe v. Moniz*, 800 F. Supp. 3d 203, 210 (D. Mass. 2025); *Helbrum v. Williams Olson*, No. 4:25-CV-00349, 2025 WL 2840273, at *4 (S.D. Iowa Sept. 30, 2025); *Ojeda Montoya v. Joyce*, No. 2:25-CV-00558, 2025 WL 3557777, at *1 n.1 (D. Me. Nov. 17, 2025). The LRA also

### 2. Section 1225(b)(2)'s text applies its no-bond authority only to noncitizens who are "seeking admission" at a border.

Section 1225(b)(2), in turn, applies only to noncitizens who are "seeking admission" into the country. Section 1225(b)(2)(A) provides that:

> in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a [removal proceeding].

*Id*. (emphasis added). With regard to the term "applicant for admission," because § 1225(a)(1), as amended by IIRIRA, "deem[s]" any noncitizen who is "present in the United States" and "has not been admitted" as an "applicant for admission," EWI noncitizens fall within that immigration term of art. But because, apart from that term of art, the term "admission" is defined to require entering the United States, 8 U.S.C. § 1101(a)(13)(A)—not simply being inside—"seeking admission" requires seeking to *enter* the United States, and EWI noncitizens are not seeking admission.

For starters, the text of § 1225(b)(2)(A) makes clear that the provision applies only "in the case of an alien who is an applicant for admission" *who is also* "an alien seeking admission." *Id*. "We must read statutes, whenever possible, to give effect to every word and phrase." *See Narragansett Indian Tribe v. Rhode Island*, 449 F.3d 16, 26 (1st Cir. 2006) (en banc). Being an "applicant for admission" and "seeking

---

raises profound constitutional concerns, *see, e.g.*, *Doe*, 800 F. Supp. 3d. at 217, but these are not before the Court.

admission" must be understood as two separate requirements for § 1225(b)(2) to

apply. Indeed, if the two phrases did not convey different requirements, § 1225(b)(2)

could have been written using only one term:

> ~~in the case of an alien who is an applicant for admission,~~ if the examining immigration officer determines that an ~~alien seeking~~ [**applicant for**] admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

Congress instead used both terms, applying § 1225(b)(2) to an "applicant for

admission" who is "seeking admission."

The definitions of "admission" and "seeking" confirm that, in limiting

§ 1225(b)(2) to noncitizens who are "seeking admission," Congress applied the

provision only to noncitizens who are at the border seeking entry, not those already

in the United States. First, the terms "admission" and "admitted" in the INA mean

"the lawful entry of the [noncitizen] into the United States after inspection and

authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). An individual

who is already in the country cannot be seeking a "lawful entry . . . into the United

States." *Id*.

With regard to "seek," dictionaries define the term to mean, *inter alia*, "to go

in search of; look for;" to "ask for" or "request;" "to try to acquire or gain; aim at,"

all of which carry a sense of *action*. *See* Oxford Encyclopedic English Dictionary

729 (3d ed. 1996) & Webster's Third New International Dictionary 2055 (1993).

Thus, the term "seeking admission" connotes present-tense action "to try to acquire or gain" a lawful entry into the United States. It does not naturally apply to EWI noncitizens who are already in the United States and not engaged in any present-tense effort to enter.

Reinforcing what the plain meaning of "seek" and the definition of "admission" suggest, the term "seeking admission" is also used in other parts of the INA in ways that involve people seeking to enter the United States, rather than simply being inside of it. For instance, 8 U.S.C. § 1736 requires that "[p]rior to the admission" of a visa waiver program participant, immigration officials must determine that "the applicant for admission" is not in certain databases that are "available to immigration inspectors at the time the alien *seeks admission* to the United States" (emphasis added). As § 1736 illustrates, "seeking admission" happens at a particular place and time—*i.e.*, when a noncitizen is seeking to enter the United States at the border.[6]

---

[6] Additional provisions also use "seeking admission" in a way that involves seeking entry into the country. For example, the INA recognizes that noncitizens can become lawful permanent residents by adjusting status from within the United States *or* by "seeking admission" as lawful permanent residents. *See, e.g.*, 8 U.S.C. § 1182(a)(4), (a)(5)(D), (d)(11)–(12); *see also* 8 U.S.C. § 1503(c) (subjecting certain individuals who seek recognition as nationals of the United States and arrive at a port of entry to provisions for "aliens seeking admission"). And under 8 U.S.C. § 1357(c), immigration officers may conduct a warrantless search of "the person" and "personal effects" of someone "seeking admission to the United States," based on a suspicion that grounds for "denial of admission" will be found—a provision that would have

Other text in § 1225(b)(2) reinforces that the border, and not the interior, is the provision's focus, supporting the natural reading of "seeking admission" to refer to someone seeking entry at the border. Under § 1225(b)(2) the "examining immigration officer" is authorized to admit a noncitizen "seeking admission" at the border if they determine that the noncitizen is "clearly and beyond a doubt entitled to be admitted." *Id.* But when a noncitizen is apprehended inside the country, an officer inquires as to whether the noncitizen is entitled to "remain in the United States," 8 U.S.C. § 1357(a)(2), and, if not, refers them for removal proceedings before an immigration judge. 8 C.F.R. § 287.3(b); *compare* 8 U.S.C. § 1101(a)(18) (defining "immigration officer"), *with id.* § 1101(b)(4) (defining "immigration judge"). Similarly, the language used in § 1225 differs from that of § 1226 in ways that show the provision's focus on the border: While § 1226 speaks of "arrest" or "apprehension" followed by "detention"—as occurs in the interior—and it requires efforts to identify and arrest noncitizens being released from jails and prisons in the United States, § 1225(b)(2) contains no language regarding searching for noncitizens in the interior, and speaks of detention following an unsuccessful "inspection," not "arrest"—another indication of § 1225(b)(2)'s focus on the border.

---

little workability and would represent an egregious encroachment on Fourth Amendment rights if applied to EWI noncitizens in the interior.

Finally, another provision of § 1225(b) shows that where Congress wished to apply § 1225(b)'s procedures to noncitizens who had already entered the country, it did so explicitly. In the context of § 1225's overall focus on inspection at the border, § 1225(b)(1)(A)(iii) gives the Executive the option of applying § 1225(b)(1)'s expedited removal provisions to certain noncitizens who are in the United States but have "not been admitted or paroled." But this *explicit* inclusion of a category of EWI noncitizens contrasts with § 1225(b)(2), which makes no mention of any application to people inside the United States.

Section 1225(b)(1)(A) is notable not only for its explicit inclusion of those who entered without inspection, but also for limitations Congress placed on that inclusion. In § 1225(b)(1), Congress allowed noncitizens who were already present in the United States to be removed without full removal proceedings only (1) upon a specific "designation" expanding expedited removal in this manner, (2) as to noncitizens without a credible fear of persecution, and (3) as to noncitizens unable to demonstrate continuous physical presence for up to two years. These limitations— reflecting some acknowledgment, even if insufficient, of the established constitutional rights of those "who have once passed through our gates, even illegally," *see Mezei*, 345 U.S. at 212—contrast with the lack of any similar constraints in § 1225(b)(2). The absence of such limiting language in § 1225(b)(2) suggests not that Congress used a cryptic turn of the pen to turn the provision into a

27

sweeping detention mandate extending all the way to long-time residents with strong claims to relief, but that Congress did no such thing.

### B. The history of IIRIRA demonstrates that Congress maintained § 1225(b)(2)'s application to the border and § 1226(a)'s application to the interior.

IIRIRA's history confirms that Congress preserved existing bond eligibility under § 1226 for EWI noncitizens rather than creating an expansive no-bond detention provision under § 1225(b)(2). This Court must "interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 573 U.S. 169, 179 (2014) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)). In this case, "the historical context" of §§ 1225 and 1226 "confirms the plain import of [their] text." *See Biden v. Texas*, 597 U.S. 785, 804 (2022). IIRIRA's context shows that Congress, 1) maintained the historical separation between detention statutes governing those at the border and those in the interior, including EWI noncitizens, and 2) knew that any significant new detention mandate would necessitate building extra detention space, and thus delayed the implementation of the mandatory detention expansion that it actually *did* enact, *i.e.*, § 1226(c) expansion—further confirmation that Congress had no intention to enact an even larger detention mandate for all EWI noncitizens.

First, when Congress enacted IIRIRA in 1996, it maintained the existing division between interior and border detention. IIRIRA was adopted against a

28

backdrop in which two separate pre-removal order detention authorities had long existed: one for noncitizens who had not entered the country and one for those who had. *See* 8 U.S.C. §§ 1225(b), 1252(a)(1) (1995). Consistent with the longstanding distinction in immigration law between those who effected an entry, and those at the threshold seeking to enter, *Mezei*, 345 U.S. at 212, those who were inside the United States could receive bond hearings under the predecessor to § 1226(a). *See* 8 U.S.C. § 1252(a)(1) (1995). Through IIRIRA, Congress then expressed its intention that § 1226(a) would "restate[]" the provisions in former § 1252(a)(1) (1995), the detention authority that had provided for "release on bond" to EWI noncitizens and admitted noncitizens inside the United States. H.R. Rep. No. 104–469, pt. 1, at 229; *accord* H.R. Rep. No. 104–828, at 210 (1996).

And Congress ensured that § 1226 would, in fact, 'restate' the predecessor provision by making a vital update to the language of the predecessor statute, which had applied to noncitizens "[p]ending a determination of deportability." *See id.*; *see also* 8 U.S.C. § 1252(a)(1) (1995). Because IIRIRA made EWI noncitizens subject to inadmissibility rather than deportability determinations, preserving the "deportability" language in § 1226 could have suggested that the statute now applied only to admitted noncitizens. But Congress replaced "[p]ending a determination of deportability" in the predecessor statute, 8 U.S.C. § 1252(a) (1995), with "pending

29

a decision on whether the alien is to be removed" in § 1226, ensuring the statute's application both to admitted noncitizens and EWI noncitizens.

By contrast, in § 1225 Congress continued using the term "seeking admission," which came from prior versions of § 1225, that governed exclusion proceedings and "[t]he inspection . . . of aliens . . . seeking admission" to the United States. 8 U.S.C. § 1225(a) (1995). "When a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.'" *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) (citation modified). Under the prior regime, those who were "seeking admission" were those "outside the United States." *Plasencia*, 459 U.S. at 25. Now, too, "seeking admission" refers to those who want to enter the United States, not those who are already present.

Second, in enacting IIRIRA's expanded mandatory detention provision for noncitizens with criminal convictions, Congress was acutely concerned about the strain on detention capacity that would be created by a mandate requiring the detention of an estimated 45,000 noncitizens subject to removal on criminal grounds each year. *See* H.R. Rep. No. 104–469, pt. 1, at 118, 120, 123. To address the problem, Congress authorized the Executive to defer implementation of § 1226(c) for two years while the agency built up its detention capacity—an option the government promptly invoked. IIRIRA § 303(b), 110 Stat. 3009–586 to 3009–587; Doris Meissner, Comm'r, INS to Henry J. Hyde, Chairman, Comm. on the Judiciary,

U.S. House of Representatives, Letter Invoking IIRIRA Transitional Period Custody Rules (Oct. 3, 1997), https://perma.cc/HFF9-MY3N.

It is implausible that the same Congress that deferred § 1226(c)'s detention mandate simultaneously enacted the largest expansion of mandatory detention in U.S. history by imposing a new detention rule for *millions* of people in the United States under § 1225(b)(2)—without a whisper in the statutory text or congressional record.[7] Surely, "if Congress had such an intent, Congress would have made it explicit in the statute, or at least some of the Members would have identified or mentioned it at some point." *Chisom v. Roemer*, 501 U.S. 380, 396 (1991); *see also Learning Res., Inc. v. Trump*, 607 U.S. ___, 2026 WL 477534, at *10 (U.S. Feb. 20, 2026) ("If Congress had intended to grant such "extraordinary power . . . it would have done so expressly."); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not, one might say, hide elephants in mouseholes."). Instead, the record contains no mention of any plan to newly subject millions of people living in the United States to detention without a bond hearing under a

---

[7] The estimated population of noncitizens in the United States who entered without inspection was about two million in 1996 and is around six million today. *See* H.R. Rep. No. 104–469, pt. 1, at 111 (estimating that individuals who entered without inspection made up about half of four million "illegal alien[s]" then living in country); Jill Wilson, et al., Cong. Rsch. Serv., R47848, *Nonimmigrant Overstays: Overview and Policy Issues*, at 1 n.6 (2023).

provision that had never previously been applied to them. *See, e.g.*, H.R. Rep. No. 104–828.

### C. The INA's humanitarian protections for those who entered without inspection support the conclusion that they are eligible for bond.

Humanitarian relief provisions of the INA that include EWI noncitizens also support the conclusion that Congress did not subject EWI noncitizens to categorical no-bond detention. Although Congress certainly aimed through IIRIRA to address illegal immigration, "no law pursues its purposes at all costs"—especially a complex statute like the INA. *Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 150 (2023) (cleaned up). In this case, the humanitarian protections also present in the INA undercut the contention that Congress mandated detention for all EWI noncitizens.

For example, under the Violence Against Women Act ("VAWA"), first enacted in 1994 and subsequently reauthorized, Congress created a pathway to adjustment of status for victims of domestic abuse and made it expressly available to EWI noncitizens. *See* 8 U.S.C. § 1255(a) (allowing adjustment of status under VAWA, even for noncitizens who entered without inspection); *see also* 8 U.S.C. § 1182(a)(6)(A)(ii).[8] Congress's purposes behind VAWA included enabling victims to leave their abusers and report abuse without fear of immigration consequences.

---

[8] Eligible EWI noncitizens may also receive other protections, including for victims of crime, *see, e.g.*, 8 U.S.C. § 1255(m) (providing for adjustment, including for EWI noncitizens), Special Immigrant Juveniles, *see, e.g.*, 8 U.S.C § 1255(h), and TPS applicants, *see, e.g.*, 8 U.S.C. § 1254a(c)(2)(A).

See H.R. Rep. No. 103–395, 1993 WL 484760 (1993); *see also* H.R. Rep. No. 106–939, at 110–12 (2000). To that end, Congress provided work authorization eligibility for VAWA self-petitioners and bona fide U visa petitioners and rendered pending and approved VAWA petitioners eligible for certain public benefits. See 8 U.S.C. §§ 1154(a)(1)(K); 1184(p)(6); 1641(a), (c).

But it would be inconsistent with these humanitarian protections provided to eligible EWI noncitizens under VAWA and other statutes for § 1225(b)(2)(A) to require their detention as soon as DHS became aware of their presence. Because the protections that Congress specifically extended to EWI noncitizens would be meaningless if DHS had been commanded to lock up noncitizen victims who entered the country without inspection each time they presented themselves to apply for the humanitarian immigration protections that Congress created for them, the humanitarian provisions of the INA reinforce the conclusion that § 1226 applies.

> **D.    Settled law establishing the due process rights of noncitizens who have entered the United States, even if unlawfully, also supports the conclusion that Congress did not silently curtail the right to a bond hearing for millions of noncitizens.**

Congress's decision to preserve access to bond proceedings as the default rule for noncitizens in the United States also accords with constitutional principles that were well established by 1996. All people inside the United States have due process rights, including noncitizens who originally entered without permission. *See Mezei*, 345 U.S. at 212; *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *A. A. R. P. v.*

*Trump*, 605 U.S. 91, 94 (2025). And civil detention within the United States for any purpose requires strong due process protections. *See Addington v. Texas*, 441 U.S. 418, 425 (1979); *see also Kansas v. Hendricks*, 521 U.S. 346, 357 (1997), *Foucha v. Louisiana*, 504 U.S. 71, 80–81 (1992); *United States v. Salerno*, 481 U.S. 739, 755 (1987). It is therefore entirely unsurprising that, when crafting a detention scheme for people arrested inside the United States on civil immigration charges, Congress preserved bond eligibility as the default rule consistent with these longstanding principles. *See* 8 U.S.C. § 1226(a).

To be sure, IIRIRA did provide for the mandatory custody of certain noncitizens in pending proceedings, but it generally limited that provision to people who had already received the "full procedural protections our criminal justice system offers" and been convicted of specified crimes. *See Demore v. Kim*, 538 U.S. 510, 513 (2003) (explaining § 1226(c)). Nothing suggests that Congress intended to so severely disregard the Constitution and decades of Supreme Court precedent by mandating detention with no due process at all for millions of people without any criminal history arrested inside the United States.

Of course, even if Congress had been unaware of the Constitution's requirements when it legislated in 1996, this Court would still be obligated to construe § 1225(b)(2) to avoid the constitutional problem that would be created by depriving Petitioners and millions of other noncitizens living in the United States of

any opportunity to have an immigration judge determine whether they pose a danger or flight risk justifying detention. *See Hernandez-Lara*, 10 F.4th at 23–24. Thus, even if the text, structure, and history of the INA left room for doubt—which they do not—this Court should still conclude that § 1225(b)(2) does not apply to Petitioners. *See INS v. St. Cyr*, 533 U.S. 289, 299–300 (2001) (citation omitted).

### E.   Congressional acquiescence to longstanding Executive Branch interpretation confirms that Congress did not impose a detention mandate that went unnoticed for decades.

Contemporaneous Executive Branch interpretation and longstanding practice also support reading § 1226 to govern Petitioners' detention. In March 1997, just months after IIRIRA's enactment, DOJ promulgated regulations reaffirming that noncitizens "who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond." 62 Fed. Reg. at 10323. And for three decades across five administrations, the government provided bond hearings under § 1226(a) to those placed into removal proceedings who entered without inspection. *See supra* at 10–13.[9]

---

[9] The government claims that "[u]ntil [2025] . . . the [BIA] had not issued any precedential opinion on the appropriate detention authority" for EWI noncitizens. O.B. 15–16. Yet in multiple precedential decisions, including one in 2025, the BIA and the Attorney General said or assumed that § 1226 governed the custody of EWI noncitizens. *See D-J-*, 23 I. & N. Dec. at 574; *Castillo-Padilla*, 25 I. & N. Dec. at 263; *Akhmedov*, 29 I. & N. Dec. at 166.

The government also relies on 8 C.F.R. § 235.3(b)(1)(ii), O.B. 37-38, to suggest that Executive Branch practice was inconsistent. The regulatory sentence at

Here, "the longstanding practice of the government can"—and should—"inform [the Court's] determination of what the law is." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (cleaned up). The government's contemporaneous interpretation of the statute and adherence to it for decades both provide "powerful evidence that interpreting the Act in [this] way is natural and reasonable," *Abramski*, 573 U.S. at 169, 203 (Scalia, J., dissenting), and cast serious doubt on the government's departure from the universally-held understanding. *See, e.g.*, *Learning Res., Inc.*, 2026 WL 477534, at *11 ("[T]he fact that no President has ever found such power in [the statute] is strong evidence that it does not exist."); *Bankamerica Corp. v. United States*, 462 U.S. 122, 130 (1983) (relying in part on "over 60 years" of government's interpretation and practice to reject its new reading).

Furthermore, "Congress' failure to repeal or revise in the face of such administrative interpretation . . . constitute[s] persuasive evidence that that interpretation is the one [Congress] intended." *Zemel v. Rusk*, 381 U.S. 1, 11 (1965).

---

issue appears in a regulation relating to expedited removal. 8 C.F.R. § 235.3(b)(1)(ii). As the District Court noted, the subsection of the same regulation that actually implemented § 1225(b)(2) applies its no-bond detention more narrowly to arriving aliens. A084–085 (citing 8 C.F.R. § 235.3(c)(1)); *see also Buenrostro-Mendez*, 166 F.4th at 507 n.14 (Douglas, J., dissenting). Not surprisingly given the regulation's inconsistency with other provisions of law, the government makes no claim that it ever implemented the regulatory detention mandate it now points to, and instead concedes otherwise. O.B. 36, 38.

36

Congress amended the immigration statute multiple times over three decades, including in post-IIRIRA legislation addressing immigration benefits and procedures, the restructuring of the immigration agencies, and judicial review of immigration matters. *See, e.g.*, USA PATRIOT Act of 2001, Pub. L. 107–56, 115 Stat. 272; Homeland Security Act of 2002, Pub. L. 107–296, 116 Stat. 2135; REAL ID Act of 2005, Pub. L. 109.13, 119 Stat. 231. But it never questioned the government's application of § 1226 to noncitizens like Petitioners. Indeed, through the LRA, it enacted legislation just last year *confirming* that application.

After 30 years of consistent understanding, it is vanishingly unlikely that Congress in 1996 "hid a herd of elephants in a mousehole, much less a herd that remained unnoticed for several decades." *Conservation L. Foundation, Inc. v. Pruitt*, 881 F.3d 24 (1st Cir. 2018). The text, context, and history do not suggest otherwise.

## II. The government offers an implausible and unsupported account of Congress's goals and the statutory text.

In the face of a clear conclusion drawn from the statutory text and history, the government asserts that Congress "never could have intended" to preserve bond eligibility for EWI noncitizens, and that—by including EWI noncitizens in the statutory term "applicants for admission"—Congress articulated a detention mandate so clear that the Court must let other parts of the statute go silent. But the government cannot point to any evidence that Congress had such broad purposes. Nor does the text support its conclusion. The government's interpretation writes

"seeking admission" out of § 1225(b)(2) and it leaves a moth-eaten remnant of § 1226. Far from pointing to a clear congressional mandate to detain EWI noncitizens without bond, the government cannot resolve the numerous problems that its statutory construction poses.

A.    **The government's assumptions of a congressional purpose to eliminate bond for noncitizens who entered without inspection are unsupported.**

The government's arguments rest heavily on an expression of congressional intent, through IIRIRA, "to replace *certain aspects* of the current 'entry doctrine,' under which illegal aliens who have entered the United States without inspection gain equities and privileges in *immigration proceedings* that are not available to aliens who present themselves for inspection at a port of entry reconstructed narrative regarding one of the purposes of IIRIRA." H.R. Rep. No. 104–469, pt.1, at 225 (emphasis added); O.B. 9, 46. Without providing any basis for its assertion, the government contends that the "privileges" Congress intended to eliminate "include[ed] the opportunity to request release on bond." O.B. 39, 46. But the government cannot point to a single expression of Congress's intent in 1996 to eliminate bond hearings for millions of EWI noncitizens.

Congress's intention to change "certain aspects" of immigration proceedings for EWI noncitizens cannot bear the weight that the government places on it. Congress *did* alter aspects of the removal process for EWI noncitizens—including

38

placing the burden of proof on them to demonstrate their entitlement to be admitted, subjecting them to inadmissibility grounds, and creating new inadmissibility grounds based on unlawful presence. *See, e.g.*, 8 U.S.C. §§ 1229a(c)(2)(A), 1182(a), 1182(a)(6)(A), (a)(7). But these changes, and the sentence of the House Report that the government repeatedly relies on, refer to the process for "determining an alien's status" *in removal proceedings*, not to detention. *See* H.R. Rep. No. 104–469, pt.1, at 225. Regarding detention, Congress expressed its intention to preserve existing detention authority, which provided eligibility for bond for EWI noncitizens. *See id.* at 229; *see also Buenrostro-Mendez*, 166 F.4th at 519 (Douglas, J., dissenting) ("a statement of general purpose attached to a separate definition provision . . . must carry less weight than statements about the specific issue disputed here" (citing cases)).

Moreover, even if Congress wanted to modify the "entry fiction," under which those who are stopped at the border have diminished due process rights even though they are on U.S. soil, it could do so (and did do so) without the drastic step of eliminating all distinctions between noncitizens who have never set foot in the United States, and those who have lived here for years without having been admitted. *See Luna Perez*, 598 U.S. at 150 (observing "no law pursues its purposes at all costs") (cleaned up). The government's reliance on *Thuraissigiam*, O.B. 47—a case that had "no occasion to consider" arguments concerning "unauthorized executive

detention," 591 U.S. at 127 & n.21—does not help it. There, the Court emphasized that noncitizens "in this country have due process rights," but treated an arriving noncitizen as functionally still at the border because he was apprehended within 25 yards thereof. 591 U.S. at 107. But Petitioners were not apprehended at the "threshold of initial entry." *See id.* Petitioner, for example, was apprehended over 10 years *after* entering the country. App'x 48. To suggest that Petitioner be treated as functionally still at the border stretches the entry fiction beyond breaking point.[10]

The government's arguments also ignore the longstanding legal "distinction between those [noncitizens] who have come to our shores seeking admission . . . and those who are within the United States after an entry, *irrespective of its legality*." *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) (emphasis added); *Zadvydas*, 533 U.S. at 693; *see also Castañon-Nava*, 161 F.4th at 1061 ("[T]he difference in treatment between a noncitizen at the border and one already in the United States fits within the broader context of our immigration law."). That established constitutional distinction would have provided ample reason—and indeed, obligation—for Congress to preserve access to bond hearings, even while it made other changes that diminished (but did not eliminate) procedural protections for EWI

---

[10] The other cases the government cites likewise address noncitizens who are either stopped at the border or paroled into the country, and thus are treated as noncitizens on the "threshold of initial entry" who stand on "different footing" from those who have entered. *Mezei*, 345 U.S. at 212; *Kaplan v. Tod*, 267 U.S. 228, 230 (1925).

noncitizens in the removal process. *See Narragansett Indian Tribe*, 449 F.3d at 26 ("[W]e must presume that Congress acts with knowledge of relevant Supreme Court precedent.").

**B.    The government's interpretation of the text renders much of § 1226(c) ineffective and makes meaningless § 1225(b)(2)'s reference to noncitizens who are "seeking admission."**

The government's interpretation of §§ 1225 and 1226 is implausible because it creates surplusage and holes that are not present in Petitioner's interpretation.

**1.    The government's reading eliminates much of § 1226's application.**

While Petitioner's interpretation of the statute gives meaning to each part of the statute, the government's interpretation leaves much of § 1226(c) inoperable. The government cannot say why Congress in IIRIRA specifically made inadmissible noncitizens subject to § 1226(c), if § 1225(b)(2) governed their detention. Nor can the government provide any reasonable explanation for why Congress in the LRA specifically focused on noncitizens who are inadmissible based on entering without inspection, if § 1225(b)(2) already barred their release on bond. *See* 8 U.S.C. § 1226(c)(1)(E)(i) (referring to § 1182(a)(6)(A), under which Petitioner was charged with being "present in the United States without being admitted or paroled").

In an attempt to address this gaping problem with its interpretation, the government asserts that § 1225(b)(2) and § 1226(c) are overlapping, and that the role of § 1226(c) is to eliminate the possibility of parole for noncitizens who are already

held in no-bond detention under § 1225(b)(2). Under this explanation, § 1226(c) is a "chameleon": some provisions of § 1226(c) (those that involve admitted noncitizens) function as an exception to *§ 1226(a)* and prevent those noncitizens from having bond hearings; while other parts (those relating to EWI noncitizens) function as an exception to *§ 1225(b)(2)* and prevent the release of noncitizens on parole, even though they are already barred from receiving bond hearings. *See Clark v. Martinez*, 543 U.S. 371, 382 (2005) (rejecting interpretation of statute that would apply the same text differently to "nonadmitted aliens").

The government's interpretation is implausible. If Congress had simply intended to eliminate parole via the LRA, it could have enacted exceptions to the parole statute, which it also amended as part of the LRA. 8 U.S.C. § 1182(d)(5). Or it could have expressly created parole exemptions. *See id.* (exempting certain noncitizens from parole eligibility). But it defies logic to interpret Congress to have changed fundamental aspects of a regulatory scheme through "a winding path of connect-the-dots provisions." *King v. Burwell*, 576 U.S. 473, 497 (2015).

The government also ignores the detention statutes' structures. Sections 1226 and 1225(b)(2) are mutually exclusive authorities that apply to noncitizens apprehended inside the country and those detained at the border, respectively. *See Jennings*, 583 U.S. at 287, 289. As a result, § 1226(c) is *not* a freestanding detention statute that applies to people subject to § 1225(b)(2) so as to preclude their release

on parole. Instead, § 1226(c) operates as *an exception to § 1226(a)*, eliminating the possibility of release on bond only for the class of noncitizens apprehended inside the country and subject to § 1226(a). *See Preap*, 586 U.S. at 397, 409–10. "[S]ubsection (c) is simply a limit on the authority conferred by subsection (a)" that requires the detention of some noncitizens who fall within § 1226(a)'s ambit. *Id*. at 409.[11]

The government also ignores the legislative history of IIRIRA, which focused extensively on creating mandatory detention for noncitizens without any suggestion that, as to many of these noncitizens, it was simply seeking to restrict parole. S. Rep. No. 104–249, at 40–41 (1996); H.R. Rep. No. 104–469, at 119, 123–24; H.R. Rep. No. 104–828, at 210-11; *see also* S. Rep. 104–48, at 32 (1995) ("Congress should consider requiring that all aggravated felons be detained pending deportation."); *Demore*, 538 U.S. at 521. The government's interpretation also ignores that Congress's efforts expressly encompassed not only lawfully admitted "criminal aliens," but also those who entered without inspection. *See, e.g.*, 104 Cong. Rec.

---

[11] The government argues that § 1225(b)(2) and the LRA "overlap under any possible reading" by encompassing noncitizens "arriving at the border." O.B. 45. But that is wrong: "arriving" noncitizens are subject to mandatory detention under § 1225(b)(2) and are not detained under § 1226. See 8 C.F.R. § 235.3(c)(1) (requiring the detention of "arriving" noncitizens under § 1225(b)(2)); *id.* § 1003.19(h)(2)(i)(B) (excluding "arriving" noncitizens from bond hearings under § 1226). Only the government's reading nullifies key parts of § 1226(c) and the LRA; Petitioners' does not.

S4599–4600 (daily ed. May 2, 1996); *see also* S. Rep. 104–48, at 4–5. Absent from the legislative history, however, is any discussion of the more sweeping detention authority proposed by the government here, much less an explanation for why Congress would have trained its attention on inadmissible noncitizens for § 1226(c) detention notwithstanding § 1225(b)(2)(A).

Lastly, the government explains the redundancies created by the LRA by saying that the act "was enacted against a backdrop in which the Government was treating aliens like Petitioner as bond-eligible." O.B. 45. But that argument only underscores that the government is now giving the immigration statutes a meaning that Congress did not intend or anticipate. The government's attempt to rewrite the detention statutes confirms that Petitioners' interpretation is the correct one.

**2.    The government's reading eliminates the "seeking admission" requirement of § 1225(b)(2).**

With regard to § 1225(b)(2), the government's interpretation functions by eliminating the statutory requirement that a noncitizen be not only an "applicant for admission," but also "seeking admission." The government's only response is to argue that *every* "applicant for admission" is necessarily "seeking admission." It claims support for this proposition in dictionary definitions of "apply" and "seek,"

and in 8 U.S.C. § 1225(a)(3) and its neighboring provisions. Its arguments are without merit.

As a threshold matter, demonstrating that EWI noncitizens could in some sense be "seeking admission" is necessary, but not sufficient, for the government to prevail. Even if EWI noncitizens could be thought of as "seeking admission" to the United States despite being already inside it—though they cannot be—the Court would still need to construe the statute as a whole. *See King*, 576 U.S. at 486 (quoting *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U. S. 280, 290 (2010)) (Courts "construe statutes, not isolated provisions"). And because including EWI noncitizens in § 1225(b)(2) would eviscerate IIRIRA and the LRA's amendments to mandatory detention in § 1226(c), and because of other evidence that Congress did not disturb the historical separation between detention in the interior under § 1226 and detention at the border under § 1225(b)(2) and had no intention to impose constitutionally suspect no-bond detention on millions of EWI noncitizens, the tools of statutory construction would still amply demonstrate that Petitioner's detention is governed by § 1226(a).

In any event, EWI noncitizens are not "seeking admission." Neither the government's attempt to equate the term-of-art "applicant for admission" with the dictionary definition of "seeking," nor its appeal to the "or otherwise" language of § 1225(a)(3), demonstrate otherwise.

45

First, the government contends applicants for admission are seeking admission because—citing dictionaries and analogizing to a person who is "applying for admission" and "seeking admission" to a college or club—it contends "*applying for something is necessarily seeking* it." O.B. 32–33. But the dispute is not about whether the action of "*applying* for admission" necessarily means one is "seeking admission." It is whether being an "*applicant for admission*"—the term of art that Congress used in § 1225(a)(1) and § 1225(b)(2)(A)—necessarily means the person is *also* "seeking admission"—the additional condition Congress included in § 1225(b)(2)(A). It does not.

By specifying that noncitizens present in the country without having been admitted were "deemed" "applicants for admission," Congress made clear that they were to be treated as inadmissible in removal proceedings and would bear the burden of proof in such proceedings—not that they would also be deemed to be "seeking admission." *See supra* at 7-8; H.R. Rep. No. 104–469, pt.1, at 231 (designation as "an alien applicant for admission" means that noncitizen "shall have the burden to establish that he or she is beyond doubt entitled to be admitted"); H.R. Rep. No. 104–828, at 212 (same). But noncitizens detained in the interior of the United States who are "deemed" to be "applicants for admission" by virtue of their unlawful entry

are not "seeking admission" as the plain meaning of the term is understood, since they are already present in the country.[12]

Moreover, if Congress intended that all "applicants for admission" should be deemed "seeking admission," it would have used fewer words in § 1225(b)(2). *See Castañon-Nava*, 161 F.4th at 1061. Since there would have been no reason for Congress to have included "seeking admission" in § 1225(b)(2) at all under the government's reading, it renders part of § 1225(b)(2) superfluous, thereby "violating one of the cardinal rules of statutory interpretation." *Castañon-Nava*, 161 F.4th at 1061 (citing *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023)).

Second, the government relies on § 1225(a)(3), which provides for the inspection of noncitizens "who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States." *Id*. The government seizes on the phrase "or otherwise" to argue that it makes "applicants

---

[12] The government's arguments would similarly suggest that being an "applicant for admission" and making an "application for admission" are the same thing. Not so. *Torres v. Barr* involved an admissibility question that turned on the timing of when a noncitizen had made an "application for admission." 976 F.3d 918, 924 (9th Cir. 2020) (en banc). The Ninth Circuit declined to treat an "applicant for admission" as making a "continuing application for admission." *See id.* at 922, 926. Rather, the phrase "the time of application for admission" in § 1182(a)(7) "refer[s] to the moment an immigrant applies to physically enter the country." *Id.* at 926–28. Likewise, under § 1225(b)(2), an "applicant for admission" is "seeking admission" only when they are trying to enter the country.

for admission" a subset of "seeking admission." O.B. 29–30. Pointing back to § 1225(b)(2), then, the government contends that because "applicant for admission" is a subset of "seeking admission," every "applicant for admission" is "seeking admission" and is subject to § 1225(b)(2)'s detention mandate. O.B. 31–33.

But "or otherwise" does not take the government so far. For starters, the phrase "or otherwise" does not demonstrate that first term is a subset of the second. "Or otherwise" *can* be used to indicate a subset, as in "running or otherwise exercising." But it can also be used to indicate overlap, as in "reading or otherwise relaxing." "A or otherwise B" indicates 1) that there is overlap between A & B and 2) that B includes (or could include) things not in A. But it may indicate *either* that A is a subset of B, *or* that A & B overlap. The INA includes such uses of "or otherwise" to convey overlap.[13]

That is the construction at work in § 1225(a)(3). Thus, for example, § 1225(a)(3) applies to noncitizens inspected by U.S. immigration officers at certain overseas preclearance sites. *See* 8 U.S.C. § 1225a. Those noncitizens are "seeking

---

[13] *See, e.g.*, 8 U.S.C. § 1153(c) ("The Attorney General shall determine . . . the total number of aliens . . . who . . . were admitted or otherwise provided lawful permanent resident status . . . ."); *id.* § 1324c(f) ("[T]he term 'falsely make' means to prepare or provide an application or document, with knowledge or in reckless disregard of the fact that the application or document contains a false, fictious, or fraudulent statement or material representation, or has no basis in law or fact, or otherwise fails to state a fact which is material to the purpose for which it was submitted.").

admission" to the United States, but because they are outside the United States, they are not "applicants for admission." But § 1225(a)(3) also applies to noncitizens returning to the country on "advance parole," *see* 8 C.F.R. § 212.5(f), a permission to travel abroad and return that may be provided to people with Deferred Action for Childhood Arrivals, for example. When inspected, noncitizens with advance parole are "applicants for admission" but are not "seeking admission" because they are being paroled, not admitted. *See* 8 U.S.C. § 1101(a)(13)(B) (distinguishing between a "paroled" noncitizen and an admitted one); *see also Ibragimov v. Gonzales*, 476 F.3d 125, 132–33 (2d Cir. 2007) (petitioner granted advanced parole was "arriving alien" and thus "applicant for admission" when he tried to reenter on parole).

As these examples demonstrate, "applicant for admission" and "seeking admission" are overlapping categories, but the use of "or otherwise" does not suggest that the first is a subset of the second. To the contrary, the government's subset construction should be avoided because it would fail to account for "applicants for admission" who are not "seeking admission" when inspected and would create surplusage in *both* § 1225(b)(2) *and* § 1225(a)(3). *See Fischer v. United States*, 603 U.S. 480, 490–91 (2024) (rejecting interpretation of "otherwise" that would render the first, narrower provision superfluous).[14]

---

[14] *Matter of Lemus-Losa*, 25 I & N. Dec. 734, 743 n.6 (B.I.A. 2012), cited by the government, does not show otherwise. The case discusses 8 U.S.C.

Finally, the government contends that § 1225(a)(4) and § 1225(a)(5) advance its position. Neither does.

Section 1225(a)(4) provides that "[a]n alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States." Section 1225(a)(5) provides that an "applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible." The government contends that these provisions support its contention that "applicants for admission" are also "applying for admission" and, more importantly, "seeking admission."

---

§ 1182(a)(9)(B)(i)(II), a ground of inadmissibility applicable to a noncitizen who "has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States." The Board reasoned that the statute's reference to a noncitizen "again" seeking admission reflects that, under 8 U.S.C. § 1225(a)(1), a noncitizen who was previously unlawfully present had already sought admission. *Lemus-Losa*, 25 I. & N. Dec. at 743 n.6. But the statute only indicates that Congress referred to someone who had previously entered unlawfully, or entered lawfully but overstayed a visa, as having sought admission at one point. It does not demonstrate that EWI noncitizens are in a perpetual state of "seeking admission." To the extent the BIA suggested otherwise, it made the same mistake the government makes here by equating the term "applicant for admission" with "seeking admission," despite Congress's use of different words. *See Loper Bright*, 603 U.S. at 373.

But, if anything, these provisions help Petitioner by reinforcing that § 1225 is, except where specified, a provision that is generally applicable to the border. Subsections (a)(4) and (a)(5) do not suggest that because EWI noncitizens are deemed "applicants for admission," they are in a permanent state of applying for and seeking admission. Rather, these provisions underscore the historical origins of § 1225 as a provision relating to the border, a characterization that Congress kept when it generally described § 1225, as amended by IIRIRA, as a provision "regarding the inspection of aliens arriving in the U.S." H. R. Rep. No. 104–828, at 208.

Subsection (a)(5) for example, describes noncitizens being questioned about their "intended length of stay," and "purposes . . . in seeking admission"—questions that are naturally asked at the border rather than in the interior. And § 1225(a)(4) is also not naturally read to suggest that an EWI noncitizen living in the United States is in a permanent state of applying for admission such that any decision to leave would constitute a withdrawal of an application. *See Torres*, 976 F.3d at 924. The more natural view of that provision, reinforced by the existence of a voluntary departure scheme for noncitizens apprehended in the interior, is that § 1225(a)(4) is generally connected to the border. *See* 8 U.S.C. § 1229c(a)(4) (clarifying that nothing in the voluntary departure statute should be construed to prevent *an arriving alien* from withdrawing their application for admission under § 1225(a)(4)).

Read as a whole, therefore, the provisions the government cites confirm that § 1225(b)(2) is a border-focused provision and that EWI noncitizens' detention is governed by § 1226, not § 1225(b)(2). That result is most consistent with the plain text of the two provisions, their statutory context, and the history of their implementation.

## III. Declining to leave the United States voluntarily is not "seeking admission."

The government also argues in the alternative that "an applicant for admission who attempts to remain in the United States" is "seeking admission" under § 1225(b)(2)(A). O.B. 39–41. But that argument ignores the statute, is foreclosed by Supreme Court precedent, misapprehends the relief Petitioner seeks, and leads to absurd results.

First, the government's alternative contention contradicts the text of § 1225(b)(2)(A), which only applies to noncitizens "seeking admission" before an "immigration officer" and not an immigration judge. *Compare id.* § 1101(a)(18) ("immigration officer" definition), *with id.* § 1101(b)(4) ("immigration judge" definition).

Second, in the overwhelming majority of cases in which a noncitizen does not voluntarily depart, noncitizens will concede that they are inadmissible as charged and seek relief from removal. The Supreme Court in *Sanchez v. Mayorkas*, 593 U.S. 409 (2021), made clear that seeking relief from removal is not the same as seeking

52

admission. *Id.* at 415–16. Although the most common forms of immigration relief afford a noncitizen "lawful status" in the country, they do not provide an "admission"; the two concepts are "distinct" in immigration law. *Id.* (discussing, *e.g.*, Temporary Protected Status and asylum).

Third, the government also argues that Petitioner is "seeking admission" because he intends to apply for cancellation of removal under 8 U.S.C. § 1229b(b)(1). O.B. 41–42. But as the government recognizes, Petitioner has already been found inadmissible. *Id.* Here, Petitioner is seeking to "cancel [his] removal" as a person already present in the United States, not "seeking admission" as he passes into this country. *See Matter of Y-N-P-*, 26 I. & N. Dec. 10, 13 (B.I.A. 2012) (finding that cancellation applicant is not "applying . . . for admission" under § 1182(h) because applicant does not "contend that there is any basis for her admission," and instead "is requesting that the [government] exercise [its] discretion to cancel her removal").[15] The District Court correctly concluded that cancellation of removal is defined by eligibility criteria different from admissibility, and that would result in adjustment of status, not admission. A018. As the INA recognizes, adjustment of status from within the United States is distinct from admission as a lawful permanent

---

[15] Other immigration relief—like deferred action (e.g., DACA, 8 C.F.R. § 236.21(c)(1)); withholding of removal, 8 U.S.C. § 1231(b)(3)(A); and protection under the Convention Against Torture, 8 C.F.R. §§ 208.16(c)(4), 208.17(a)—bar effectuating a removal order. Such relief also does not confer "admission."

resident. *See, e.g.*, 8 U.S.C. § 1182(a)(4)(C) (referring to "[a]ny alien who seeks admission or adjustment of status"). The government's cited cases, O.B. 41–42, are far afield. *See, e.g.*, *Mejia-Orellana v. Gonzales*, 502 F.3d 13, 16 (1st Cir. 2007) (addressing cancellation eligibility for person who "acquired permanent resident status by fraud or misrepresentation").

Fourth, the government's alternative reading of "seeking admission" creates absurdities. Under its theory, individuals who seek no relief and instead opt for voluntary departure—meaning they will leave in a matter of weeks—can request bond. Yet, individuals who are eligible for relief—and, as a result, are the most suitable for bond because of their significant community ties, lack of criminal history, and other equities—are subject to mandatory detention. The government's position would also suggest that bond eligibility can change over time (for instance, if someone withdraws their application) or depend on the kind of relief a person seeks (e.g., before an immigration officer or immigration judge). A rule that turns on such factors would make no sense.

## CONCLUSION

The Court should affirm the decisions below.

Dated: March 10, 2026

Michael K.T. Tan
My Khanh Ngo
Oscar Sarabia Roman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, 7th Floor
San Francisco, CA 94104
(415) 343-0770
m.tan@aclu.org
mngo@aclu.org
osarabia@aclu.org

Judy Rabinovitz
Natalie Behr
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
jrabinovitz@aclu.org
IRP_NBehr@aclu.org

Gilles R. Bissonnette
SangYeob Kim
Chelsea Eddy
AMERICAN CIVIL LIBERTIES
UNION OF NEW HAMPSHIRE
18 Low Avenue
Concord, NH 03301
(603) 333-2081
gilles@aclu-nh.org
sangyeob@aclu-nh.org
chelsea@aclu-nh.org

Annelise M. Jatoba de Araujo
Annelise Araujo Law, LLC
260 Franklin Street, Suite 520
Boston, MA 02110

Respectfully submitted,

*/s/ Adriana Lafaille*
Jessie J. Rossman
Daniel L. McFadden
Adriana Lafaille
Julian Bava
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
dmcfadden@aclum.org
alafaille@aclum.org
jbava@aclum.org

Christopher E. Hart
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, MA 02210
(617) 832-1000
chart@foleyhoag.com

Sameer Ahmed
Harvard Immigration and Refugee
Clinical Program
Harvard Law School
6 Everett Street
Cambridge, MA 02138
(617) 384-0088
sahmed@law.harvard.edu

Carol J. Garvan
Max I. Brooks
AMERICAN CIVIL LIBERTIES
UNION
OF MAINE FOUNDATION
P.O. Box 7860

55

(617) 716-6400
annelise@annelisearaujolaw.com

Portland, ME 04112
(207) 619-8687
cgarvan@aclumaine.org
mbrooks@aclumaine.org

*Counsel for Petitioner-Appellee*

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing brief complies with the type-volume limitation of

Fed. R. App. P. 32(a)(7)(B) because it contains 12,995 words, excluding the parts of

the document exempted by Fed. R. App. P. 32(f), and this brief complies with the

typeface requirements of Fed. R. App. 32(a)(5) and the type-style requirements of

Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced and

easy-to-read typeface using Microsoft Word in 14-point size font.

/s/ *Adriana Lafaille*
Adriana Lafaille
March 10, 2026
*Counsel for Petitioner-Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2026, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the First Circuit by using the CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ *Adriana Lafaille*
Adriana Lafaille
March 10, 2026
*Counsel for Petitioner-Appellee*
