# United States Court of Appeals
## For the First Circuit

---

Nos. 25-2152, 26-1094

JOSÉ ARNULFO GUERRERO ORELLANA,

Petitioner, Appellee,

v.

ANTONE MONIZ, Superintendent, Plymouth County Correctional Facility; DAVID J. VENTURELLA, Acting Director, U.S. Immigration and Customs Enforcement; MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security; TODD BLANCHE, U.S. Attorney General; DAVID WESLING, Acting Field Office Director; DAREN K. MARGOLIN, Director, Executive Office for Immigration Review,

Respondents, Appellants,

PATRICIA H. HYDE, Acting Director of Boston Field Office, U.S. Immigration and Customs Enforcement,

Respondent.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

---

Before

Montecalvo, Lynch, and Dunlap,
Circuit Judges.

---

John Bailey, Counsel to the Assistant Attorney General, with whom Brett A. Shumate, Assistant Attorney General, Yaakov M. Roth, Principal Deputy Assistant Attorney General, Drew C. Ensign, Deputy Assistant Attorney General, and Benjamin Hayes, Senior

Counsel to the Assistant Attorney General, Civil Division, U.S. Department of Justice, and August Flentje, Special Counsel, Katherine J. Shinners, Senior Litigation Counsel, and Laurie Wiesner, Trial Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, were on brief, for appellants.

Matt A. Crapo and Christopher J. Hajec, on brief for the Federation for American Immigration Reform as amicus curiae supporting appellants.

Adriana Lafaille, with whom Jessie J. Rossman, Daniel L. McFadden, and Julian Bava, American Civil Liberties Union Foundation of Massachusetts, Inc., Michael K.T. Tan, My Khanh Ngo, Oscar Sarabia Roman, Judy Rabinovitz, and Natalie Behr, American Civil Liberties Union Foundation, Gilles R. Bissonnette, SangYeob Kim, and Chelsea Eddy, American Civil Liberties Union of New Hampshire, Annelise M. Jatoba de Araujo, Annelise Araujo Law, LLC, Christopher E. Hart, Foley Hoag LLP, Carol J. Garvan and Max I. Brooks, American Civil Liberties Union of Maine Foundation, and Sameer Ahmed, Harvard Immigration and Refugee Clinical Program, Harvard Law School, were on brief, for appellee.

Emma Winger, Rebecca Cassler, and Suchita Mathur, on brief for the American Immigration Council and the American Immigration Lawyers Association as amici curiae supporting appellee.

Amit Jain, Kathleen Pleiss, Roderick & Solange, and MacArthur Justice Center, on brief for Immigration Law Scholars as amici curiae supporting appellee.

Robert Bonta, Attorney General, State of California, Letitia James, Attorney General, State of New York, Michael L. Newman, Senior Assistant Attorney General, Robin L. Goldfaden, Marissa Malouff, Supervising Deputy Attorney General, and Julia Heming Segal, Deputy Attorney General, California Attorney General's Office, Barbara D. Underwood, Solicitor General, Philip J. Levitz, Senior Assistant Solicitor General, Gillian Barna, Assistant Solicitor General, and Julie Dona, Special Counsel, NYS Office of the Attorney General, Kristin K. Mayes, Attorney General, State of Arizona, Philip J. Weiser, Attorney General, State of Colorado, William Tong, Attorney General, State of Connecticut, Kathleen Jennings, Attorney General, State of Delaware, Brian L. Schwalb, Attorney General, District of Columbia, Anne E. Lopez, Attorney General, State of Hawai'i, Kwame Raoul, Attorney General, State of Illinois, Aaron M. Frey, Attorney General, State of Maine, Anthony G. Brown, Attorney General, State of Maryland, Andrea Joy Campbell, Attorney General, Commonwealth of Massachusetts, Dana Nessel, Attorney General, State of Michigan, Keith Ellison, Attorney General, State of Minnesota, Aaron D. Ford, Attorney General, State of Nevada, Jennifer Davenport, Acting Attorney General, State of New Jersey, Dan Rayfield, Attorney General, State of Oregon, Peter

F. Neronha, Attorney General, State of Rhode Island, Charity R. Clark, Attorney General, State of Vermont, Jay Jones, Attorney General, Commonwealth of Virginia, Nicholas W. Brown, Attorney General, State of Washington, on brief for States of New York, California, Arizona, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, Virginia, Washington, and the District of Columbia as amici curiae supporting appellee.

James Joseph Beha, II and Baker Bott LLP, on brief for Former Immigration Judges and Appellate Immigration Judges as amici curiae supporting appellee.

_____

August 13, 2026

_____

**MONTECALVO**, **Circuit Judge**.   The Immigration and Nationality Act (INA) requires the detention of certain noncitizens pending removal proceedings under 8 U.S.C. § 1225(b)(2)(A) and allows for the release of other noncitizens on bond or conditional parole pursuant to § 1226(a).  In this case, we evaluate which of these two statutory provisions govern Petitioner-Appellee José Arnulfo Guerrero Orellana, a Salvadoran national who entered the United States without inspection approximately thirteen years ago.  To do so, we focus much of our inquiry on whether Guerrero Orellana, who entered this country unlawfully and thus, under the INA, is deemed an "applicant for admission," is defined in the statute to be necessarily also "seeking admission," as required by the mandatory detention provision at § 1225(b)(2)(A).  Because we conclude that the term "seeking admission" means seeking lawful entry, and Guerrero Orellana already entered the country unlawfully, we hold that he is not "seeking admission."  For this reason, and others discussed below, we agree with the district court that Guerrero Orellana and his fellow class members' detention (and eligibility for release) are governed by § 1226(a), not § 1225(b)(2)(A).  Thus, the district court was right to order the government to release Guerrero Orellana or provide him with a bond hearing.  We **affirm**.

- 4 -

## I.

We begin with some background about the Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA), the legislation that amended the statutory provisions before us on appeal. Then we turn to the facts and procedure underlying this case.

## A.

In 1996, Congress enacted IIRIRA, ushering in significant changes to the INA.[1] See Pub. L. 104-208, 110 Stat. 3009 (1996). Most relevant to this appeal is how IIRIRA impacted the immigration detention provisions codified at § 1225 and § 1226. In broad terms, § 1226 serves as a source of discretionary detention authority and allows for the release, on bond or conditional parole, of noncitizens who are subject to this section.

---

[1] For example, IIRIRA introduced a singular "removal" proceeding in place of prior "exclusion" and "deportation" proceedings. See Pub. L. 104-208, § 304, 110 Stat. 3009-587 to 3009-597 (1996). In the newly created "removal" proceedings, governed by § 1229a, noncitizens would be charged with grounds of "inadmissibility" or "deportability," a concept we will explain more later.

IIRIRA also created procedures called "expedited removal" -- a swifter removal process with fewer procedural protections than § 1229a removals. See id. § 302, 110 Stat. 3009-579 to 3009-584. Expedited removal applies only to certain noncitizens (1) who are "arriving in the United States" or have "not been admitted or paroled" and fail to show their continuous presence in the United States for two years, and (2) who are inadmissible for misrepresentation under § 1182(a)(6)(C) or lack of valid entry documentation under § 1182(a)(7). See 8 U.S.C. § 1225(b)(1)(A)(i), (iii).

See 8 U.S.C. § 1226(a).  But, through amendments at § 1226(c), IIRIRA required certain "criminal" noncitizens to remain detained throughout the pendency of their removal proceedings, disallowing their release on bond.[2]  § 303, 110 Stat. at 3009-585; see 8 U.S.C. § 1226(c).  The question we address focuses on how IIRIRA applied mandatory detention in a different provision of the INA: § 1225(b)(2)(A).  And it concerns whether that provision applies to noncitizens who entered the United States without inspection.

For nearly thirty years after IIRIRA's enactment, immigration officials detained noncitizens who were present in the United States after entering without inspection pursuant to § 1226.  Unless they were subject to the mandatory detention provision at § 1226(c) for certain criminal or terrorism-related reasons, they could be released on bond or conditional parole pending resolution of their removal proceedings.[3]

---

[2] Following the lead of the title of § 1226(c) ("Detention of criminal aliens"), we will occasionally refer to noncitizens subject to mandatory detention under this provision as "criminal" noncitizens.  See Nielsen v. Preap, 586 U.S. 392, 398-99.  But we employ this shorthand only for brevity, noting that not all grounds that trigger mandatory detention under § 1226(c) require a criminal conviction.  See, e.g., 8 U.S.C. § 1226(c)(1)(E) (requiring detention where the noncitizen has been "arrested for" or "charged with" certain offenses).

[3] When considering a noncitizen's eligibility for release from detention on bond, an immigration judge considers whether the individual poses a "danger to the community" or a "flight risk." See Hernandez-Lara v. Lyons, 10 F.4th 19, 27 (1st Cir. 2021).

That understanding and administration of § 1226 through five different presidents changed on July 8, 2025, when the U.S. Department of Homeland Security (DHS) issued interim guidance requiring the detention of all noncitizens who had entered the United States without inspection pursuant to § 1225. In this new policy, DHS "revisited its legal position on detention and release authorities," and for the first time determined that § 1225, not § 1226, was "the applicable detention authority" for "applicants for admission." IIRIRA deems noncitizens (1) who are "present in the United States" and who "[have] not been admitted" and (2) those who "arrive[] in the United States" to be "applicant[s] for admission" under the INA. 8 U.S.C. § 1225(a)(1). Thus, noncitizens who have entered the United States without inspection are considered "applicant[s] for admission" as individuals present in the United States without admission. See id. The DHS guidance newly interpreted § 1225(b) to require that all applicants for admission would now be treated the same as "'arriving aliens' [had] historically been treated," and thus instructed U.S. Immigration and Customs Enforcement (ICE) to detain all applicants for admission under § 1225(b) throughout their removal proceedings, without access to a bond hearing. Instead of release after a bond hearing, noncitizens subject to the guidance could only be released pursuant to DHS's discretionary parole authority under § 1182(d)(5)(A), which allows the DHS Secretary to parole into the

- 7 -

United States, "on a case-by-case basis," certain noncitizens for "urgent humanitarian reasons or significant public benefit." See 8 U.S.C. § 1182(d)(5)(A).

Two months later, this policy became precedent through the Board of Immigration Appeals' (BIA) decision in Matter of Yajure Hurtado. 29 I. & N. Dec. 216, 225 (B.I.A. 2025). There, the BIA held that, under the "plain language" of § 1225(b)(2)(A), immigration judges "lack authority" to release noncitizens "who are present in the United States without admission" on bond. Id. In consequence, the number of noncitizens held in detention increased. It was reported as of mid-January 2026 that the government's new mandatory detention policy had resulted in approximately 73,000 noncitizens being detained, "the highest level" of detention ever recorded. See Camilo Montoya-Galvez, ICE's Detainee Population Reaches New Record High of 73,000, as Crackdown Widens, CBS News (Jan. 16, 2026), https://www.cbsnews.com/news/ices-detainee-population-record-high-of-73000/ [https://perma.cc/EY9J-QZ27].

## B.

With this context in mind, we turn now to the Petitioner in this appeal. While the specific place and time of Guerrero Orellana's entry to the United States are unknown, the parties

- 8 -

agree that he entered "without inspection, admission, or parole" and has resided here since 2013.[4]

On September 18, 2025, during a vehicle stop in Everett, Massachusetts, ICE arrested Guerrero Orellana. Shortly thereafter, officials placed him in removal proceedings, detained him, and transferred him to a detention center in Plymouth, Massachusetts. ICE charged Guerrero Orellana as inadmissible for being present in the United States without admission or parole and for lacking valid entry documentation. See 8 U.S.C. § 1182(a)(6)(A)(i), (a)(7)(A)(i)(I). Consequently, in appellants' view, he fell within the group of noncitizens that the BIA determined was ineligible for release on bond in Yajure Hurtado. See 29 I. & N. Dec. at 225.

Guerrero Orellana challenged the legality of his detention without a bond hearing through a habeas petition filed on September 18, 2025, in the U.S. District Court for the District of Massachusetts. He later amended his petition to serve as a class representative for similarly situated noncitizens.

On October 3, 2025, the district court, concluding that Guerrero Orellana was likely to succeed on the merits of his claim, entered a preliminary injunction ordering his release within seven days unless he was given a bond hearing. Six days later, Guerrero

_____

[4] Guerrero Orellana's habeas petition indicates that he "entered the United States without inspection in June 2013."

- 9 -

Orellana received a bond hearing, and the immigration judge found a change of custody status was warranted and ordered him released on a $3,500 bond.  In his removal proceedings, which remain ongoing, Guerrero Orellana seeks cancellation of removal under 8 U.S.C. § 1229b(b).

Following Guerrero Orellana's release from detention, the district court certified the proposed class and continued forward to the merits.[5]  On December 19, 2025, the district court granted partial summary judgment and partial final judgment for Guerrero Orellana and the class and denied the government's cross-motion for partial summary judgment.  The district court held that DHS's policy of detaining class members under § 1225(b)(2)(A) without access to a bond hearing violated the INA and its regulations.  It further held that class members were not subject to mandatory detention under § 1225(b)(2)(A), but rather, were subject to § 1226(a) and thus must be considered for release on bond.

---

[5] The class, which the district court modified on December 19, 2025, includes noncitizens arrested or detained in Massachusetts or within a Massachusetts immigration court's jurisdiction who satisfy certain criteria.  Because the government does not appeal the district court's class certification order, we need not address the scope of the class in detail.  But we briefly highlight a few components of the class definition: namely, it includes noncitizens who were allegedly never admitted or paroled into the United States and excludes noncitizens subject to expedited removal orders or proceedings, as well as those subject to mandatory detention under § 1226(c).

The government timely appealed the district court's orders granting a preliminary injunction and partial summary judgment. We now address those consolidated appeals.

## II.

The questions before us are of pure statutory interpretation. The key question is: does § 1226 apply to Guerrero Orellana and his fellow class members, permitting their release on bond pending resolution of their removal proceedings, or does § 1225(b)(2)(A) apply, thus mandating their detention? The district court held that the class is governed by § 1226, thus permitting class members' potential release on bond. We review that legal determination de novo. Fraga v. Premium Retail Servs., Inc., 61 F.4th 228, 233 (1st Cir. 2023).

## A.

To answer the question of interpretation before us, we begin, as we always do, with the text of the disputed statutory provisions: § 1226 and § 1225(b)(2)(A). See Lackey v. Stinnie, 604 U.S. 192, 199-200 (2025); Dor v. Bondi, 161 F.4th 1, 8 (1st Cir. 2025).

## i.

Starting with § 1226, as discussed, this section authorizes the arrest and detention of certain noncitizens and permits their release on bond or conditional parole. Subsection (a) reads:

**(a) Arrest, detention, and release**

> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—
>
> > (1) may continue to detain the arrested alien; and
> >
> > (2) may release the alien on—
> >
> > > (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
> > >
> > > (B) conditional parole . . . .

8 U.S.C. § 1226(a).[6]

Following subsection (a)'s general authorization for release on bond or conditional parole, subsection (c) carves out exceptions, mandating the detention of noncitizens charged with specific criminal and terrorism-related grounds of inadmissibility and deportability. See id. § 1226(c)(1); Jennings v. Rodriguez, 583 U.S. 281, 288-89 (2018). There is an important difference between "inadmissibility" and "deportability," as we outline in the footnote below.[7] Subsection (c) states:

---

[6] A note on terminology. The INA uses the term "alien" to refer to a "noncitizen." Throughout this opinion, we replicate quoted language as it appears in the original source but otherwise use the term "noncitizen."

[7] In removal proceedings, DHS charges noncitizens with "inadmissibility" grounds if they entered the United States without being admitted or paroled, and places the burden of proof

- 12 -

**(c) Detention of criminal aliens**

(1) Custody
The Attorney General shall take into custody any alien who-

> (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
>
> (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
>
> (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year,
>
> (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title, or
>
> (E)(i) is inadmissible under paragraph (6)(A), (6)(C), or (7) of section 1182(a) of this title; and (ii) is charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person,

---

on them to demonstrate that they are not inadmissible. <u>See generally</u> 8 U.S.C. § 1182; <u>see also</u> <u>id.</u> § 1229a(c)(2)(A). In contrast, noncitizens who were admitted to the country (meaning they entered lawfully, such as with a valid visa) but later become removable (for example, due to certain criminal convictions), are charged with grounds of "deportability," which the government bears the burden of proving. <u>See generally</u> <u>id.</u> § 1227; <u>see also</u> <u>id.</u> § 1229a(c)(3)(A).

> when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

Id. § 1226(c)(1).

Guerrero Orellana argues that the text of subsections (a) and (c) demonstrates that § 1226 applies to noncitizens who entered the United States without inspection and that this textual conclusion is supported by the structure of IIRIRA. Concerning subsection (a) allowing release, he points to its use of these terms: it applies to "an alien," allowing for their arrest and detention, as well as release on bond or conditional parole "pending a decision" about whether they will be "removed." Id. § 1226(a). This broad language, he points out, makes "no exception based on the circumstances of a noncitizen's entry into the country." And by referencing a pending decision concerning removal, he argues, § 1226(a) applies both to noncitizens charged with deportability grounds and noncitizens like him who were never admitted and thus are subject to inadmissibility grounds. Concerning subsection (c), he points out that the mandatory detention carveouts cover both noncitizens charged with deportability and inadmissibility grounds, and argues that this, too, confirms § 1226's application to noncitizens who entered without inspection, who are subject to inadmissibility grounds. See id. § 1226(c)(1)(A), (D), (E).

- 14 -

The government acknowledges that § 1226(a) authorizes the Executive to arrest and detain, as well as release "any 'alien' pending removal proceedings." But it also argues that "any 'alien' pending removal proceedings" does not mean all noncitizens subject to removal proceedings. It argues instead that the language applies only to those noncitizens "who are not 'applicants for admission' subject to § 1225(b)(2)(A)." Put simply, the government maintains that § 1226 applies only to noncitizens "who have been admitted to the United States but are now deportable," such as individuals who overstayed their visas. It cites no direct authority for this assertion, but instead, points us to the other disputed provision in this appeal, § 1225(b)(2)(A), to support its argument.

**ii.**

Separate from the detention authority in § 1226, which permits release on bond or conditional parole, § 1225(b)(2)(A) mandates the detention of certain noncitizens as follows:

> Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for [removal] proceeding[s] under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(A).

To interpret this provision more nimbly, we divide it by clauses, following the natural breaks indicated by punctuation. Doing so gives us four clauses:

> **1:** Subject to subparagraphs (B) and (C),
>
> **2:** in the case of an alien who is an applicant for admission,
>
> **3:** if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted,
>
> **4:** the alien shall be detained for [removal] proceeding[s] under section 1229a of this title.

Id. (citation modified).

We start with what is not in dispute, which is clauses 1, 2, and 4. Clause 1 carves out individuals to whom § 1225(b)(2)(A) does not apply and provides the Attorney General with discretion to return certain noncitizens to territories bordering the United States, rather than detain them.[8] See id.; see also id. § 1225(b)(2)(B)-(C). Next, under clause 2, a noncitizen must be an "applicant for admission" for § 1225(b)(2)(A) to apply. Id. § 1225(b)(2)(A). As mentioned, the

---

[8] Namely, under subparagraph (B), § 1225(b)(2)(A)'s mandatory detention provision "shall not apply" to crewmen, stowaways, and individuals subject to expedited removal. Id. § 1225(b)(2)(B). And under subparagraph (C), for noncitizens described in § 1225(b)(2)(A) who are "arriving on land" to the United States from a contiguous foreign territory, "the Attorney General may return" them to that territory (rather than detain them), pending removal proceedings. Id. § 1225(b)(2)(C).

INA deems a noncitizen "an applicant for admission" if he or she is (1) "present in the United States" and has "not been admitted," or (2) "arrives in the United States."  Id. § 1225(a)(1).  Guerrero Orellana and class members concede (and we agree) that because they are present in this country and have not been admitted, they are deemed "applicants for admission."  Finally, clause 4 mandates detention for noncitizens who meet the criteria set forth in the prior clauses, pending resolution of their removal proceedings.  Id. § 1225(b)(2)(A).

The parties vigorously dispute the meaning of clause 3, namely, whether its use of the phrase "seeking admission" must mean the same thing as "applicant for admission," as used in clause 2.  We start by considering clause 3 -- which we will refer to from here on as the "if clause" -- once more.  It states:

> if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted . . .

Id. (emphases added).  Under the "if clause," an "examining immigration officer" is tasked with making a determination about: (1) "an alien seeking admission," (2) concerning that person's "entitle[ment] to be admitted" and the strength of the noncitizen's argument for admission.  Id.  Only if the examining officer determines the noncitizen is not "clearly and beyond a doubt entitled to be admitted," (and only where the individual also meets

- 17 -

the requirements laid forth in the prior clauses), is that noncitizen subject to mandatory detention under § 1225(b)(2)(A). Noting that the examining officer's determination involves these two components, we analyze them each in turn.

First, the officer's determination concerns "an alien seeking admission." Here, the parties dispute the meaning of part of that phrase: "seeking admission." To interpret this, we begin with any statutorily-defined terms, because when Congress defines a term, "we must follow that definition, even if it varies from a term's ordinary meaning." Van Buren v. United States, 593 U.S. 374, 387 (2021) (citation modified). As for undefined terms, our understanding is "gleaned from a consideration of the 'ordinary, contemporary, common meaning' of the terms." Delaware v. Pennsylvania, 598 U.S. 115, 128 (2023) (quoting Sandifer v. United States Steel Corp., 571 U.S. 220, 227 (2014)). The phrase "seeking admission" is not statutorily defined, but the term "admission" is defined in the statute. "[A]dmission" means "the lawful entry of [an] alien into the United States after inspection and authorization by an immigration officer."[9] 8 U.S.C.

_____

[9] "Entry," although once defined in the INA, no longer is defined there, so we look to its plain and ordinary meaning. It is defined as "the act of entering," and "enter," in turn, means "to go or come into a material place." Webster's Third New International Dictionary 756, 759 (Philip Babcock Gove ed., 1993). Indeed, this aligns with our precedent. While this circuit has stopped short of announcing a "definitive definition of 'entry,'" we have looked approvingly at definitions requiring "a crossing

§ 1101(a)(13)(A) (emphasis added); <u>Mullin</u> v. <u>Al Otro Lado</u>, 146 S. Ct. 2079, 2087 (2026) (explaining that "an alien cannot lawfully enter this country without first being inspected by an immigration officer").  Next, we look to "seeking."  As it is not defined in the INA, we consider its ordinary meaning: "to try to acquire or gain."[10]  <u>Merriam-Webster's Collegiate Dictionary</u> 1057 (10th ed. 1994); <u>see</u> <u>City of Providence</u>, 954 F.3d 23, 31 (1st Cir. 2020); <u>American Heritage Dictionary</u> 1633 (def. 2) (3d ed. 1992) ("[t]o endeavor to obtain or reach"); <u>Oxford English Dictionary</u> 876 (def. 5.1.a) (2d ed. 1989) ("[t]o go in search or quest of; to try to find, look for").  "Putting the pieces together," then, a noncitizen is "seeking admission" if they are trying to gain lawful entry into the United States after inspection and authorization by an immigration officer.  <u>Cf.</u> <u>Montgomery</u> v. <u>Caribe Transp. II, LLC</u>, 146 S. Ct. 1199, 1204-05 (2026) (employing a similar analytical

---

into the territorial limits of the United States," and have acknowledged that entry requires that the noncitizen "cross the United States border free from official restraint."  <u>Dimova</u> v. <u>Holder</u>, 783 F.3d 30, 38-40 (1st Cir. 2015)(citation modified); <u>cf.</u> <u>Mullin</u> v. <u>Al Otro Lado</u>, 146 S. Ct. 2079, 2090 (2026) (considering the ordinary meaning of "arrives in the United States," and concluding that it "clear[ly]" means that "[a] person arrives in a geographic location only when he enters it").

[10] Notably, the present participle "seeking" implicates an active, present tense action.  <u>See</u> <u>United States</u> v. <u>Wilson</u>, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes."); <u>see also</u> <u>Santillan Quiroz</u> v. <u>Mullin</u>, 180 F.4th 1226, 1238 (10th Cir. 2026) (noting that the use of the present participle "seeking" rather than "seek" "requires present and continuing action").

approach).  It is clear on its face that Guerrero Orellana and his fellow class members entered the United States.  And both parties agree that they did so unlawfully.  Thus, the text leads us to the rather straightforward conclusion: Guerrero Orellana and his fellow class members are not "seeking admission" under § 1225(b)(2)(A) because they have already unlawfully entered the United States.  To conclude otherwise would defy the plain language of the statute.[11]

Second, the examining officer's determination as described in the "if clause" concerns whether the noncitizen seeking admission is "entitled to be admitted."  8 U.S.C. § 1225(b)(2)(A).  "[A]dmitted," as used here, and "admission," as used in "seeking admission," carry the same statutory definition. See 8 U.S.C. § 1101(a)(13)(A).  Both terms mean "the lawful entry of [an] alien into the United States after inspection and authorization by an immigration officer."  Id.  For § 1225(b)(2)(A) to apply then, the examining immigration officer necessarily must ascertain whether the noncitizen has a right to lawfully enter the United States.  And logically, that determination takes place at

---

[11] When questioned at oral argument about how class members could possibly be seeking lawful entry to the United States from within the country, the government maintained that because class members have not "yet" entered the United States lawfully, "by operation of law, they are seeking admission."  But this argument contorts the plain meaning of "entry," as used in the statutory definition of "admission" (lawful entry), beyond recognition.

- 20 -

the time the noncitizen seeks entry -- hence, the inclusion of this language immediately following "seeking admission."  Id. § 1225(b)(2)(A).  Here again, only after Guerrero Orellana was found in a traffic stop in Massachusetts was he identified as being in the country unlawfully by ICE.  And whoever at ICE identified Guerrero Orellana was not evaluating whether he could lawfully enter the United States, since he had already entered the country without inspection years prior.[12]

This leads to our conclusion that the "if clause" is not satisfied here.  The clause can only be satisfied if the examining immigration officer determines that a noncitizen "seeking admission" is not clearly "entitled to be admitted."  Id.  Guerrero Orellana and class members had already entered the country without inspection -- so, they are not "seeking admission."  And thus, a determination concerning whether they are "entitled to be admitted," i.e. to be granted lawful entry, is impossible.

The dissent takes issue with the word-by-word and clause-by-clause approach to interpreting § 1225(b)(2)(A) that we just employed, raising several arguments that it contends point to a contrary reading.  Principally, the dissent avers that our "definitional exercise" is misguided and that the real task before

---

[12] Rather, they were evaluating whether he should be charged with inadmissibility grounds and referred for removal proceedings, which he in fact was.

- 21 -

this court concerns "giving effect" to a different provision, namely, what the dissent refers to as the "deeming provision" in § 1225(a)(1).  Our reading of § 1225(b)(2)(A), says the dissent, "nullifies" that deeming provision.

We respectfully disagree for a number of reasons.  We find that the dissent relies on an assumption that lacks textual support in the deeming provision it points to and, in so doing, violates the applicable rules of statutory construction the Supreme Court mandates lower courts must follow.  Precisely because this deeming provision knowingly departs from reality to create a legal fiction different from Congress's normal legislative use of common language, this deeming provision cannot be read to include language which Congress chose not to use in creating that fiction.

Additionally, the dissent, in attempting to reframe the issue before this court, fails to interpret the provision actually before us, § 1225(b)(2)(A).  Indeed, the dissent reaches a reading of that provision that, in our view, defies the statutory language Congress used.  Our interpretation, in contrast, gives effect to every word of § 1225(b)(2)(A) and, contrary to the dissent's assertion, does nothing to nullify § 1225(a)(1).  We will explain, but before we do, we begin with our points of agreement.

We agree with the dissent that § 1225(a)(1) informs our interpretation of § 1225(b)(2)(A), as § 1225(a)(1) describes who is deemed an "applicant for admission," and "applicant for

admission," in turn, appears in clause 2 of § 1225(b)(2)(A).  And we agree that § 1225(a)(1) states that a noncitizen who "arrives in the United States" or who is "present" here and "has not been admitted" "shall be deemed for purposes of this chapter an applicant for admission."[13]   8 U.S.C. § 1225(a)(1) (emphasis added).  Indeed, based on this text, earlier in this opinion, we easily concluded that Guerrero Orellana is deemed an "applicant for admission."

Where we disagree with the dissent is in the leap in reasoning that it makes next.  The dissent asserts that because the deeming language of § 1225(a)(1) creates "a legal fiction"

---

[13] The dissent's argument rests on framing § 1225(a)(1) as a "deeming" provision rather than a "definitional" provision.  We need not decide this issue because, as we will explain, even if we accept § 1225(a)(1) as a deeming provision rather than definitional, we remain unconvinced by the dissent's argument.  We note that our sister circuits have cast doubt on the importance of that distinction here.  See, e.g., Santillan Quiroz, 180 F.4th at 1243 (rejecting the "premise that only words like 'means' and 'defined' can create a statutory definition" and concluding that because "deemed" in § 1225(a)(1) "specifically directs how to construe or understand the meaning of a particular phrase, [it] is definitional").  Indeed, nearly all of our sister circuits to "consider[] whether § 1225(a)(1) supplie[s] the definition for the phrase 'applicant for admission' ha[ve] answered that question in the affirmative," including those that reached a contrary conclusion from the one we reach today.  Lopez-Campos v. Raycraft, 175 F.4th 713, 728 (6th Cir. 2026) (citing, among other cases, decisions issued by the Second, Fifth, Seventh, Eighth, and Eleventh circuits); see also Cirrus Rojas v. Olson, No. 25-3127, --- F.4th ---- 2026 WL 2198315, at *8 (7th Cir. July 30, 2026) (concluding that § 1225(a)(1) "is definitional"); Santillan Quiroz, 180 F.4th at 1243 (same);  but see generally Rodriguez Vazquez v. Bostock, No. 25-6842, --- F.4th ---- 2026 WL 2196424 (9th Cir. July 30, 2026) (not addressing this issue).

whereby noncitizens who "have not affirmatively applied for anything" are "treated as 'applicant[s] for admission'" simply because "they are present in the United States without having been admitted," Congress must have meant that all applicants for admission are "seeking admission" as that language appears in § 1225(b)(2)(A).  Dissent at 4 ("If a person whom Congress has deemed an applicant for admission is not seeking admission, it is hard to know what Congress thought it was deeming him to be." (quoting Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami, 175 F.4th 1258, 1291 (11th Cir. 2026) (Lagoa, J., dissenting))).  This argument can be summarized as follows: "[T]he legal fiction that 'a person is deemed to be A' also deems that person to have all of A's ordinary attributes and meanings." Santillan Quiroz v. Mullin, 180 F.4th 1226, 1242 (10th Cir. 2026) (summarizing similar dissenting arguments).  Thus, according to the dissent's reasoning, "when § 1225(a)(1) deems certain noncitizens to be applicants for admission, it also deems them to be seeking admission." See id.

The problem is that this leap between the deeming language of § 1225(a)(1) and its alleged effect on § 1225(b)(2)(A) is contradicted by the text of § 1225(a)(1).  The text "deem[s]" certain noncitizens "applicant[s] for admission" but says nothing to indicate that they are also deemed to be "seeking admission." See 8 U.S.C. § 1225(a)(1) (devoid of any such language).  Nor is

that assumption supported by the sole case that the dissent relies on, Sturgeon v. Frost, 587 U.S. 28 (2019). Unlike in § 1225(a)(1), the deeming language at issue in Sturgeon was immediately followed by language "expressly stat[ing] the consequence" of the deeming language.[14] 587 U.S. at 49. Here, where "Congress [has] deem[ed] a person as 'A' but remains silent about whether that person is also deemed as 'B,'" we will "not infer that Congress meant to

---

[14] In Sturgeon, the Supreme Court evaluated section 103(c) of the Alaska National Interest Lands Conservation Act to resolve a dispute over which lands in Alaska were subject to the National Park Service's regulatory authority. Section 103(c) provides that:

> Only those lands within the boundaries of any conservation system unit which are public lands . . . shall be deemed to be included as a portion of such unit. No lands which, before, on, or after December 2, 1980, are conveyed to the State, to any Native Corporation, or to any private party shall be subject to the regulations applicable solely to public lands within such units.

16 U.S.C. § 3103(c) (emphasis added). The Court explained that the deeming language in the "first sentence" of that provision, underlined above, "set[] out the essential distinction[] relating to what qualifies as parkland": namely, "that only the 'public lands' (essentially, the federally owned lands) within any system unit's boundaries would be 'deemed' a part of that unit." Sturgeon, 587 U.S. at 47 (citation modified). And critically, the Court explained that "the effect of that exclusion" was "expressly state[d]" in the very next sentence, namely, that "non-public lands, including waters," were exempt "from the Park Service's ordinary regulatory authority." Id. at 48-49 (emphasis added). But here, § 1225(a)(1) includes no such express language imbuing it with the broad effect that the dissent claims it has.

- 25 -

deem the person as 'B,' too." <u>Santillan Quiroz</u>, 180 F.4th at 1244 (emphasis added).[15]

We must also reject the dissent's expansive understanding of the so-called deeming provision because it leads to a reading of § 1225(b)(2)(A) that defies the text of that provision. Recall that § 1225(b)(2)(A) refers to both "admission" and "admitted," <u>see</u> 8 U.S.C. § 1225(b)(2)(A) ("alien seeking <u>admission</u>" and "entitled to be <u>admitted</u>"), reinforcing, through repetition, Congress's purposeful choice to include these statutorily-defined terms. Terms which, as discussed at length, mean the "lawful entry" of a noncitizen "into the United States after inspection and authorization." 8 U.S.C. § 1101(a)(13)(A).

_____

[15] The dissent, taking issue with our view of its expansive reading of the deeming provision as violating rules of statutory construction, asserts that it knows of no rule "demanding that deeming clauses be functionally treated as definitional in nature." But that misapprehends our points. Our role as courts "is to interpret the language of the statute enacted by Congress," <u>Barnhart</u> v. <u>Sigmon Coal Co.</u>, 534 U.S. 438, 461 (2002), and in so doing, "resist reading words or elements into a statute that do not appear on its face," <u>Bates</u> v. <u>United States</u>, 522 U.S. 23, 29 (1997). Congress's creation of a legal fiction does not give courts license to extend the operation of that legal fiction beyond the statutory text Congress used to create it. <u>See</u> <u>Simmons</u> v. <u>Himmelreich</u>, 578 U.S. 621, 627 (2016) ("Absent persuasive indications to the contrary, we presume Congress says what it means and means what it says."); <u>see also</u> <u>Jama</u> v. <u>Immigr. and Customs Enf't</u>, 543 U.S. 335, 341 (2005) (stating that "we do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply"). Our reading, then, is not a narrowing of the deeming provision as the dissent suggests, but rather, an honoring of the text of that provision as it exists. The dissent's reading, in contrast, impermissibly broadens the scope of the deeming provision beyond the statutory text.

When one carefully parses the language of § 1225(b)(2)(A) then, it is clear that § 1225(b)(2)(A) applies only if an applicant for admission is seeking lawful entry to the United States and an immigration officer determines that he or she is not "clearly and beyond a doubt" entitled to lawfully enter.   8 U.S.C. § 1225(b)(2)(A).   Because we cannot replace the language Congress wrote with what the dissent suggests Congress meant, we must reject the dissent's argument.[16]   See Atl. Sounding Co. v. Townsend, 557

---

[16] Several other circuits have rejected the leap required by the dissent's expansive reading of the deeming provision for similar reasons. See, e.g., Cirrus Rojas, 2026 WL 2198315, at *6 (rejecting argument that because petitioner is "'deemed' an 'applicant for admission,' he is also deemed to be all that flows from that term's ordinary meaning -- including 'seeking admission'" as "mix[ing] an admitted legal fiction with fact"); Rodriguez Vazquez, 2026 WL 2196424, at *13-15 (concluding that because "applicant for admission" is "a term of art," a "plain meaning comparison" of this phrase with "seeking admission" fails to "account for the stylized treatment of [applicant for admission] and the default plain meaning treatment of [seeking admission]"). For example, in Cirrus Rojas, the Seventh Circuit found a lack of textual support for the government's efforts "to read 'seeking admission' into" § 1225(a)(1).   2026 WL 2198315, at *6.   It observed that the presence of "seeking admission" in § 1225(b)(2)(A) compared with the absence of this phrase in § 1225(a)(1) constituted a "meaningful variation" that it could not ignore. Id.   In addition to a lack of textual support, the Seventh Circuit spotlighted how IIRIRA struck a provision that "would have 'deemed' individuals like [Guerrero Orellana] as 'seeking entry and admission'" from the INA before that provision could ever go into effect, thereby "ensur[ing] that 'seeking admission' remained undefined in [§] 1225(b)(2)(A)." Id. at *6 n.4 (citing Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 414, 110 Stat. 1214, 1270 and IIRIRA, § 308(d)(2)(D), 110 Stat. at 3009-617).   This legislative history, as we see it, further undermines the expansive view of § 1225(a)(1)'s deeming provision that the dissent adopts.

U.S. 404, 424 (2009) ("[W]e will not attribute words to Congress that it has not written.").

The dissent's assertion that our interpretation of § 1225(b)(2)(A) "nullifies" the deeming language in § 1225(a)(1) similarly fails in our view.  Section 1225(a)(1) instructs that its two-part description of "applicant for admission" -- including noncitizens who arrive in the United States and those present here who have not been admitted -- applies "for purposes of this chapter," referring to Chapter 12 of Title 8 of the U.S. Code, which codifies the entirety of the INA.  8 U.S.C. § 1225(a)(1) (emphasis added).  We do not view Congress's choice in (b)(2)(A) to mandate detention of some but not all applicants for admission through its inclusion of the "if clause" as nullifying (a)(1).  To the contrary, under our reading, "applicant for admission," as used in § 1225(b)(2)(A), remains fully intact and it is the "if clause" that effectively limits the application of § 1225(b)(2)(A) to only those "applicants for admission" who are "arriv[ing] in the United States."  Similarly, our reading does not nullify (a)(1)'s deeming language in any other part of the INA.  As our sister circuits have pointed out, "applicant for admission" is used throughout the INA and "takes on its full scope" in sections that do not include the kind of limiting clause found in § 1225(b)(2)(A).   See Santillan Quiroz, 180 F.4th at 1246 (discussing "applicant for admission" as that term appears, for

example, in §§ 1225(a)(3) and 1229a(c)(2)); see also 8 §§ U.S.C. 1105, 1182, 1187, 1225, 1229a (employing "applicant for admission" in other sections of the INA).

The government, like the dissent, also urges us to bypass our text-based interpretation of § 1225(b)(2)(A) by arguing that all applicants for admission are "necessarily 'seeking admission.'" To do so, the government relies not on statutory text or on dictionary definitions but by resort to analogy. Analogizing to a college applicant, the government reasons, just as a person "applying" for admission to college is necessarily "seeking" admission to that college, a noncitizen who is "'applying' for admission to the United States . . . is necessarily 'seeking admission' to the United States." Guerrero Orellana counters that Congress chose to have § 1225(b)(2)(A) apply only to those applicants for admission who are "seeking admission," namely, those "seeking to enter the United States," not those like him who did not seek admission and instead entered the United States without inspection.

We acknowledge that two circuit court majorities have accepted the government's college applicant analogy. See Buenrostro-Mendez v. Bondi, 166 F.4th 494, 502 (5th Cir. 2026); Avila v. Bondi, 170 F.4th 1128, 1134 (8th Cir. 2026). But the government provides no reason to think that Congress had such an analogy in mind. We reject that analogy and in doing so join six

other circuits.  See Barbosa da Cunha v. Freden, 175 F.4th 61, 75-76 (2d Cir. 2026); Hernandez Alvarez, 175 F.4th at 1266-67; Lopez-Campos v. Raycraft, 175 F.4th 713, 729 (6th Cir. 2026); Santillan Quiroz, 180 F.4th at 1241-42; Rodriguez Vazquez v. Bostock, No. 25-6842, --- F.4th ---- 2026 WL 2196424, at *15 (9th Cir. July 30, 2026); Cirrus Rojas v. Olson, No. 25-3127, --- F.4th ---- 2026 WL 2198315, at *8 (7th Cir. July 30, 2026).[17]

Our conclusion is supported by yet a different rule of statutory interpretation: the surplusage canon.  This canon instructs courts to "give meaning to the words of a statute in a manner that avoids redundancies."  See United States v. Freeman, 147 F.4th 1, 22 (1st Cir. 2025).  It guides us to "read statutes, whenever possible, to give effect to every word and phrase." Narragansett Indian Tribe v. Rhode Island, 449 F.3d 16, 26 (1st Cir. 2006) (en banc).  Guerrero Orellana argues that the government's interpretation of § 1225(b)(2)(A) violates this canon

---

[17] In any event, we find the government's college applicant analogy flawed.  The term "applicant for admission" includes noncitizens "present" in the United States "who ha[ve] not been admitted," 8 U.S.C. § 1225(a)(1), and so, for the college analogy to work, "a college would have to deem an individual physically located on its campus at any point in time to be an 'applicant for admission' to that college, including an individual who had never filed an application and had no intention of doing so." Barbosa da Cunha, 175 F.4th at 76.  And even beyond that, "no one would consider an individual who never applied [to the college] to also be 'seeking admission'" to it.  Id.

by rendering "seeking admission" superfluous.  If the government's interpretation is right, and every "applicant for admission" is necessarily "seeking admission," there would have been no need for Congress to include "seeking admission" in the provision at all. The government counters that even if "applicant for admission" and "seeking admission" are redundant under its interpretation of § 1225(b)(2)(A), the cannon is inapplicable for two contradictory reasons.  First, it argues "redundancies are common in statutory drafting."  See Barton v. Barr, 590 U.S. 222, 239 (2020).  Second, it argues that under Guerrero Orellana's interpretation of § 1225(b)(2)(A), it is the term "applicant for admission" that is rendered superfluous.

We agree with Guerrero Orellana that "seeking admission" is rendered superfluous under the government's interpretation. Although the surplusage canon "is not a silver bullet," Rimini St., Inc. v. Oracle USA, Inc., 586 U.S. 334, 346 (2019), it is a meaningful interpretive tool, particularly when, as here, "a competing interpretation would avoid superfluity."  Bufkin v. Collins, 604 U.S. 369, 387 (2025); see also Al Otro Lado, 146 S. Ct. at 2092.  The government, in interpreting "applicant for admission" and "seeking admission" as meaning essentially the same thing, reads "seeking admission," -- which, again, means seeking lawful entry -- out of the statute.  Guerrero Orellana's

- 31 -

interpretation, in contrast, does not read "applicant for admission" out of the statute, but rather limits its scope.[18]

The government argues that Guerrero Orellana's interpretation of § 1225(b)(2)(A) renders the entirety of clause 2, "in the case of an alien who is an applicant for admission," surplusage. If that were so, § 1225(b)(2)(A) would have the exact same effect even if clause 2 were eliminated. But the logic is otherwise. To give an example, consider noncitizens at a pre-inspection site in the Dublin airport who plan to fly from Ireland to the United States. See generally 8 U.S.C. § 1225a. They, in presenting themselves to the U.S. Customs and Border Patrol officer at the pre-inspection site, are "seeking admission" to the United States. If the government's argument were correct

---

[18] The dissent acknowledges that the government's reading of § 1225(b)(2)(A) renders "seeking admission" duplicative but tolerates this redundancy as an acceptable byproduct of "inartful" drafting. Indeed, the dissent considers the erasure of this phrase a "minor interpretive cost" compared to what it considers the nullification "of a deeming provision across an entire statutory section." But as explained, our interpretation of § 1225(b)(2)(A) has no such nullifying effect on § 1225(a)(1). It bears repeating: the fact that Congress inserted additional language in § 1225(b)(2)(A) to limit this provision's application to only certain "applicant[s] for admission" does nothing to negate § 1225(a)(1). We add that the dissent, while arguing forcefully to preserve its perception of the reach of § 1225(a)(1)'s "deeming provision," appears to discount the massive overlap that the government's reading of § 1225(b)(2)(A) creates with § 1226(c). See Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami, 175 F.4th 1258, 1280 (11th Cir. 2026) (explaining that this is no "small overlap," but rather, "a serious statutory redundancy"). More on that to come.

and Guerrero Orellana's interpretation of § 1225(b)(2)(A) swallows up "applicant for admission" whole, then if the examining officer determines that the noncitizens are not "entitled to be admitted" to the United States, § 1225(b)(2)(A)'s mandatory detention provision kicks in, requiring the detention of those individuals while abroad in Ireland.

Guerrero Orellana's interpretation avoids this illogical outcome and shows why "applicant for admission" is not rendered surplusage, as the government contends.  For § 1225(b)(2)(A) to apply, the individual must first be an "applicant for admission" to even continue on to the "if clause."  Here, because the noncitizen travelers located in Dublin are neither "arriving" to the United States nor "present" in the United States without admission, it makes no difference that they are "seeking admission," because they are not "applicant[s] for admission." Thus, failing to satisfy clause 2, the inquiry ends there, and § 1225(b)(2)(A)'s mandatory detention provision does not apply. (And, rather than be detained by the U.S. government in Ireland, the individual is simply not allowed to board the flight.)

It is Congress's prerogative to limit the application of one statutory phrase through the inclusion of another; it is not our prerogative to read language out of a statute.  See Narragansett Indian Tribe, 449 F.3d at 26; Stanard v. Olesen, 74 S. Ct. 768, 771 (1954) ("[I]t is for Congress, not the courts, to

write the law."). Considering it "[b]etter to live with the mystery [of why Congress chose the language it did] than to rewrite the statute," we must reject the government's interpretation.[19] See Montgomery, 146 S. Ct. at 1207.

In sum, our careful study of the disputed statutory texts leads us to join the Second, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits in holding that noncitizens like Guerrero Orellana who are present in the United States without admission are not subject to § 1225(b)(2)(A)'s mandatory detention provision, but rather, are governed by § 1226. See Barbosa da Cunha, 175 F.4th at 70-71; Lopez-Campos, 175 F.4th at 723; Cirrus Rojas, 2026 WL 2198315, at *2; Rodriguez Vazquez, 2026 WL 2196424, at *3; Santillan Quiroz, 180 F.4th at 1233, 1246; Hernandez Alvarez, 175 F.4th at 1261-62.

---

[19] In reaching a contrary reading, the dissent offers that had Congress meant to limit the scope of § 1225(b)(2)(A) as we find it did, it "could have used the [narrower] phrase" "arriving alien[]" instead of "applicant for admission." That Congress could have used any number of alternative or additional words is beside the point. We must interpret § 1225(b)(2)(A) as written, including not only its reference to "applicant for admission" in clause 2, but also its inclusion of clauses 1, 3, and 4. That clause 3, the "if clause," effectively limits the scope of which applicants for admission will be subject to § 1225(b)(2)(A)'s mandatory detention provision is a policy choice that Congress had every right to elect. Our job, in interpreting the law, is to "give effect . . . to every word Congress used." In re Fin. Oversight & Mgmt. Bd. for Puerto Rico, 7 F.4th 31, 37 (1st Cir. 2021) (emphasis added) (quoting Nat'l Ass'n of Mfrs. v. Dep't of Def., 583 U.S. 109, 128-29 (2018)).

**B.**

Because "the meaning of statutory language, plain or not, depends on context," we continue on to consider the parties' additional arguments.  Holloway v. United States, 526 U.S. 1, 7 (1999) (citation modified); see Niz-Chavez v. Garland, 593 U.S. 155, 165 (2021) (confirming textual analysis of specific statutory provisions by considering IIRIRA's broader "statutory structure and history").  These arguments only reinforce our conclusion.

**i.**

First, we consider the government's contention that other provisions of § 1225 support its interpretation of § 1225(b)(2)(A).  The government begins with subsection (a)(4), which permits a noncitizen who is "applying for admission" to "withdraw the application for admission and depart immediately from the United States."  8 U.S.C. § 1225(a)(4).  The government reasons that the "application" referenced here must be that of an "applicant for admission," and thus, it infers, so long as a noncitizen remains an "applicant for admission," they must be "applying for admission."  The problem with the government's reasoning is that subsection (a)(4) does not use "applicant for admission" -- it uses "applying for admission."  Id.  The present participle "applying" suggests the noncitizen is taking an active step towards lawful entry to the United States.  See United States v. Wilson, 503 U.S. 329, 333 (1992) (discussing the significance

- 35 -

of verb tenses).  And that differs from the statutory meaning of "applicant for admission," which includes noncitizens taking no action at all who simply satisfy the passive condition of being present in the United States unlawfully.  See 8 U.S.C. § 1225(a)(1).  Thus, the government's (a)(4) argument is unavailing.

The government next directs us to subsection (a)(5), which states, "applicant[s] for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States," such as length of stay, intent to remain permanently or become a U.S. citizen, and inadmissibility. Id. § 1225(a)(5) (emphases added).  The underlined language, the government reasons, suggests that applicants for admission must be seeking admission.  We see two flaws in this argument.  For one, subsection (a)(5)'s reference to an immigration officer questioning a noncitizen about their length of stay and intentions indicates the reference applies at the border and ports of entry. And second, its statement that a noncitizen "may" be required to make these statements under oath, not "shall," indicates that this line of questioning occurs only in certain contexts -- namely, when an applicant for admission is "seeking admission," i.e. lawful entry, to the United States.

Perhaps the government's strongest contextual argument concerns subsection (a)(3), titled "Inspection." Id. § 1225(a)(3). This provision requires all noncitizens "who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States" to be "inspected by immigration officers." Id. The government argues that the use of "or otherwise" means that "applicants for admission" must be included within the broader category of individuals "seeking admission." We agree with the government that "or otherwise" is often used to indicate that one term is subsumed within another category. But that is not always so. "[O]r otherwise" also indicates "something that is different from something already mentioned." Barbosa da Cunha, 175 F.4th at 78 (quoting Or Otherwise, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/or%20othe rwise [https://perma.cc/9F9H-PH6Q]). And precedent reflects that "or otherwise" does not always confer the subset-superset relationship that the government alleges. In Helsinn Healthcare S.A. v. Teva Pharmaceuticals, USA, Inc., for example, the Supreme Court declined to read the phrase "or otherwise available to the public" in the Leahy-Smith America Invents Act as limiting the terms that preceded it. See 586 U.S. 123, 132 (2019). Instead, the Court held, this phrase "capture[d] material that [did] not

fit neatly into the statute's enumerated categories but [was] nevertheless meant to be covered." Id.

To put the government's argument to test, we again turn to an example: noncitizens returning to the United States on "advance parole." Individuals granted certain forms of immigration relief, such as Deferred Action for Childhood Arrivals (DACA), must request advance parole to return to the United States after trips abroad. See generally 8 C.F.R. § 212.5(f). When they return, they are "arriv[ing]" to the United States and thus are considered "applicants for admission." See 8 U.S.C. § 1225(a)(1). But because they are being "paroled" into the country, a distinct concept from being "admitted," they are not "seeking admission." Compare 8 U.S.C. § 1101(a)(13)(A) (defining "admission"), with id. § 1101(a)(13)(B) (explaining that a "paroled" noncitizen "shall not be considered to have been admitted"). In this example, then, the government's argument that § 1225(a)(3)'s use of "or otherwise" indicates that "applicant for admission" is a smaller category necessarily included within the broader category of "seeking admission" fails. Individuals returning to the United States on advance parole are "applicants for admission," but are not "seeking admission." Thus, because "or otherwise" does not

function as the government alleges, we reject this attempt to undercut our textual reading.[20]

### ii.

Next, the government contests our conclusion that its reading of § 1225(b)(2)(A) impermissibly "render[s] superfluous portions of § 1226(c)" (the separate mandatory detention authority applying to certain criminal noncitizens discussed earlier). While acknowledging that its interpretation would indeed result in "overlap for some aliens," the government maintains that § 1225(b)(2)(A) and § 1226 still each have "independent effect." That is so, it argues, because the "discretionary detention authority in § 1226(a)" remains intact, allowing for the detention of <u>admitted</u> noncitizens who later become "deportable."[21] And that is also so, it continues, because § 1226(c) independently limits

---

[20] A final word on the government's argument about subsection (a)(3). Recall that this subsection reads, "or otherwise seeking admission or readmission to or transit through the United States." Notably, "admission" is directly followed by the terms "readmission to" and "transit through" the United States. <u>Id.</u> § 1225(a)(3). Because those words are commonly associated with determinations made at the border, this sheds light on the meaning of "seeking admission," and reaffirms our interpretation that "seeking admission" means seeking lawful entry to the country. <u>See</u> <u>Dubin</u> v. <u>United States</u>, 599 U.S. 110, 124 (2023) (noting that "a word is known by the company it keeps" (citation modified)).

[21] Indeed, the government argues that § 1226 is the "exclusive" detention authority for admitted noncitizens who later become deportable.

DHS's authority to release on parole certain noncitizens already subject to no-bond detention under § 1225(b)(2)(A).[22]

Neither of these arguments are persuasive. For one, the government's argument that § 1226(a) provides the detention authority for admitted noncitizens only is inconsistent with § 1226(c)'s carveouts mandating detention of certain criminal noncitizens charged with inadmissibility grounds -- which, as discussed, apply only to noncitizens who have not been admitted. See 8 U.S.C. § 1226(c)(1)(A), (D), (E); cf. Nielsen v. Preap, 586 U.S. 392, 409 (2019) (explaining that § 1226(c) derives from the authority in § 1226(a)). In fact, three of the five subsections in § 1226(c)(1)'s mandatory detention provision apply to noncitizens charged with inadmissibility grounds. See 8 U.S.C. § 1226(c)(1)(A), (D), (E). Thus, the overlap that the government's interpretation of § 1225(b)(2)(A) creates with § 1226 is far from minor.

---

[22] Some background is needed to digest this argument. Earlier, we noted that DHS has discretionary authority under 8 U.S.C. § 1182(d)(5)(A) to temporarily release qualifying noncitizens from custody on parole. But that discretionary parole authority is limited for noncitizens detained under § 1226(c). That is because § 1226(c)(4) allows release only where necessary to protect certain witnesses and cooperating persons implicated in major criminal investigations, and where release does not present a danger to others or a flight risk. See 8 U.S.C. § 1226(c)(4). Thus, the government argues, § 1226(c) does independent work from § 1225(b)(2)(A) by limiting DHS's ability to release certain noncitizens on § 1182(d)(5)(A) parole.

Perhaps the most compelling legal and practical example in support of Guerrero Orellana's argument is the tension that the government's interpretation of § 1225(b)(2)(A) causes with § 1226(c)(1)(E) ("subsection (E)"). Congress added subsection (E) to the INA in 2025, through the Laken Riley Act. Laken Riley Act § 2, Pub. L. 119-1, 139 Stat. 3 (2025). This new subsection mandates detention of noncitizens charged with inadmissibility under § 1182(a)(6)(A) for being "present in the United States without admission or parole" if they have been arrested, charged, convicted of, or admit to certain criminal offenses. 8 U.S.C. § 1226(c)(1)(E). If we accept the government's interpretation of § 1225(b)(2)(A) as already mandating the detention of all noncitizens present in the United States without admission, Congress's addition of subsection (E) through the Laken Riley Act was entirely duplicative. The government insists this is not so because, by limiting the availability of release on parole for certain unadmitted noncitizens subject to detention under § 1225(b)(2)(A), subsection (E) does "independent work." We are unconvinced. For one, the government cites no authority demonstrating that this was Congress's aim. And indeed, had that been Congress's purpose, it could have easily enumerated a parole exception in the parole statute at § 1182(d)(5) (which already enumerates other such exceptions), or in § 1225(b)(2) itself. See

- 41 -

Hernandez Alvarez, 175 F.4th at 1280; see also 8 U.S.C. § 1182(d)(5)(B).

But more critically, this argument fails because it requires us to conceptualize § 1225(b)(2)(A) and § 1226 as overlapping authorities. After all, the premise that subsection (E) has independent force by limiting release on parole only works if we understand certain unadmitted noncitizens as subject to both § 1225(b)(2)(A) (mandating their detention) and § 1226(c) (limiting their release through (c)(4)). Guerrero Orellana objects to this characterization, arguing that § 1226 and § 1225(b)(2) are "mutually exclusive authorities." As we will now explain, Guerrero Orellana's argument better aligns with the statutory structure of IIRIRA as understood and described by the Supreme Court.

**iii.**

In considering guiding Supreme Court precedent, we turn first to Nielsen v. Preap and conclude that Guerrero Orellana's argument finds support in the Court's description of § 1226 in that case. See 586 U.S. at 409. In Preap, the Court clarified that § 1226(c)'s mandate to detain certain criminal noncitizens is not a "separate" source of detention authority from § 1226(a), but rather, "a limit on the authority conferred by subsection (a)" that curbs the Secretary of Homeland Security's discretion over the arrest and release of specified criminal noncitizens. See id.

- 42 -

Thus, because the detention mandate at § 1226(c) derives from the general detention authority at § 1226(a), the government's argument that Guerrero Orellana and class members cannot be released on parole under § 1226(c) would make the authority for their detention § 1226, not § 1225. And this is precisely the argument that the government claims to be arguing against.

Next, we consider Jennings v. Rodriguez and conclude that Guerrero Orellana's argument aligns with the Supreme Court's explanation in that case of § 1225 and § 1226 as separate authorities that apply to different noncitizen groups. See 583 U.S. at 289. In Jennings, the Court explained:

> U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c).[23]

Id. This description reinforces the idea that § 1225(b)(2)(A) and § 1226 apply to different categories of noncitizens, undermining the government's contention about the Laken Riley Act's independent value, which makes sense only if a noncitizen is subject to both § 1225(b)(2)(A) and § 1226. The above-quoted language also reinforces our interpretation of the disputed statutes more broadly. In it, the Court refers to

---

[23] Section 1225(b)(1), referenced in the quoted passage from Jennings, concerns noncitizens subject to expedited removal.

§ 1225(b)(2) as the detention authority for noncitizens "seeking admission into the country" and § 1226 as the detention authority for those "already in the country."[24] Id.  The government objects, arguing that the Supreme Court's language is "ambiguous" and merely "uncertain dicta."  But we see nothing ambiguous about it.  And while we agree with the government that this language was not essential to the outcome in Jennings (which concerned whether §§ 1225(b), 1226(a), and (c) gave noncitizens a right to periodic bond hearings throughout their detention) and thus is likely dicta, see Arcam Pharm. Corp. v. Faria, 513 F.3d 1, 3 (1st Cir. 2007), it is not "uncertain," either.  Jennings concerned §§ 1225 and 1226 -- the same statutory sections before us here -- and the above-quoted language served as a summary paragraph following a reasoned explanation of how those two sections function.  See 583 U.S. at 287-89.  As a lower court, we must treat the Supreme

---

[24] This construction is supported by the titles Congress used in IIRIRA, too.  While we do not elevate titles over statutory text, they are "'tools available for the resolution of a doubt' about the meaning of a statute."  Dubin, 599 U.S. at 120-21 (quoting Almendarez-Torres v. United States, 523 U.S. 224, 234 (1998)).  And here, we consider it notable that the title of section 303 of IIRIRA, which amended 8 U.S.C. § 1226, specifically references noncitizens "not lawfully in the United States," in contrast with the title of section 302, which amended 8 U.S.C. § 1225.  Compare IIRIRA, § 303, 110 Stat. 3009-585 (titled "Apprehension and detention of aliens not lawfully in the United States (revised section [1226])" (emphasis added)), with id. § 302, 110 Stat. 3009-579 (titled "Inspection of aliens; expedited removal of inadmissible arriving aliens; referral for hearing (revised section [§ 1225])").

Court's "carefully considered statements" as "authoritative," even if they are dicta. Crowe v. Bolduc, 365 F.3d 86, 92 (1st Cir. 2004) (citation modified). Thus, we afford the Court's explanation in Jennings of the statutory structure of § 1225 and § 1226 "great weight."[25] See id.

In sum, Guerrero Orellana's interpretation of the disputed statutory provisions here aligns with Supreme Court precedent explaining how §§ 1225 and 1226 function.[26] The

---

[25] We quickly reject the government's argument that Jennings supports its interpretation of § 1225(b)(2)(A) because the Supreme Court referred to § 1225(b)(2) in Jennings as a "catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)." See 583 U.S. at 287. The government leaves out the rest of the sentence and the Court's citation. The complete quotation reads: "[§ 1225(b)(2)] serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1) (with specific exceptions not relevant here). See §§ 1225(b)(2)(A), (B)." Id. (emphasis added). Because the Supreme Court noted that there are "specific exceptions" to how this "catchall provision" functions and cited § 1225(b)(2)(A) directly while doing so, it is clear that this phrase does not reach as broadly as the government contends.

[26] While the Supreme Court's recent decisions in Mullin v. Al Otro Lado and Blanche v. Lau were not yet published when the parties briefed and argued the case before us, those decisions support our conclusion here, too. See generally Al Otro Lado, 146 S. Ct. 2079; Lau, 146 S. Ct. 1981. In Al Otro Lado, the Court evaluated the legality of the government's "metering" policy at the United States-Mexico border. 146 S. Ct. at 2088-90. It held that a noncitizen "arrives in the United States" as that phrase appears in 8 U.S.C. §§ 1158(a)(1) and 1225(a), thus triggering an inspection and opportunity to apply for asylum, "only when he crosses the border," and not when he tries but fails "to set foot in this country." Id. at 2086-87, 2090. And in Lau, the Court held that border officers did not bear the burden of proving "by clear and convincing evidence" that a lawful permanent resident returning to the United States following a trip abroad had committed a crime involving moral turpitude and thus correctly

- 45 -

government's interpretation, in contrast, fails to give meaning to all the language Congress enacted in § 1225(b)(2)(A) and simultaneously nullifies large swaths of § 1226(c). Thus, we must reject the government's interpretation.

#### iv.

The government next contends that § 1225(b)(2)(A) mandates Guerrero Orellana's detention even under his own interpretation of this provision. By remaining in the United States to apply for cancellation of removal in his removal

---

charged him with inadmissibility grounds rather than deportability grounds. 146 S. Ct. at 1985-86, 1990. Although neither case definitively explains the meaning of "seeking admission" as we must here, it is noteworthy that the Court's discussions of that phrase or of the similar phrase "seeking an admission" concern border and port-of-entry contexts, not contexts in the interior of the United States. See Al Otro Lado, 146 S. Ct. at 2086-88 (addressing the meaning of "arrives in the United States" in the context of noncitizens who "seek[] to enter the United States from Mexico," and describing the origins of DHS's metering policy as a response to a "surge of aliens seeking admission at ports of entry along the U.S.-Mexico border (emphases added)); see also Lau, 146 S. Ct. at 1986-87 (determining that Petitioner could be regarded as "seeking an admission," rather than treated as "admitted" as is usually the case for returning lawful permanent residents when Petitioner, who had been criminally charged with trademark counterfeiting, sought reentry to the United States at an international airport). Overall, these cases buttress our conclusions concerning § 1225(b)(2)(A)'s disputed "if clause": namely, that "seeking admission" means seeking lawful entry into the United States, and that the examining immigration officer's determination about whether the noncitizen is entitled to be admitted is a determination made at the border and ports of entry.

proceedings, rather than immediately departing the country, the government argues, Guerrero Orellana is "seeking admission."

We see several problems with this argument. First, as Guerrero Orellana points out, § 1225(b)(2)(A) contemplates an "immigration officer" determining whether the noncitizen seeking admission is entitled to be admitted -- not an "immigration judge" in removal proceedings. 8 U.S.C. § 1225(b)(2)(A); see id. § 1101(a)(18), (b)(4) (defining "immigration officer" and "immigration judge" separately). Second, this argument suffers from the same faulty interpretation of "seeking admission" addressed throughout this opinion -- we reiterate: seeking admission means seeking lawful entry. Guerrero Orellana cannot satisfy that requirement because he is not seeking to enter the country; he is already present in the United States and is instead seeking relief from removal. And lastly, this argument mistakenly equates "lawful status" with "admission." If the immigration judge presiding over Guerrero Orellana's removal proceedings ultimately grants him cancellation of removal, he will adjust status to that of a lawful permanent resident, thus gaining lawful status. But this will not undo his unlawful entry into the United States. "Lawful status and admission . . . are distinct concepts in immigration law." Sanchez v. Mayorkas, 593 U.S. 409, 415 (2021). One may be "lawfully present in the United States, but nevertheless

- 47 -

not 'admitted.'"[27]  Hernandez Alvarez, 175 F.4th at 1269.   Thus, whether or not Guerrero Orellana wins relief in his removal proceedings, applying for cancellation of removal is distinct from seeking admission and does not eliminate his "unlawful entry" into the United States.[28]  See Sanchez, 593 U.S. at 415.

_____

[27]  The dissent's acceptance of the assertion that all applicants for admission, including those present in the United States without admission, are "by operation of law seeking admission" runs headlong into the Supreme Court's explanation of "admission" and "[l]awful status" as "distinct concepts" in Sanchez v. Mayorkas.   593 U.S. 409, 415 (2021).   The Court explained:

> On the one hand, a foreign national can be admitted but not in lawful status -- think of someone who legally entered the United States on a student visa, but stayed in the country long past graduation.  On the other hand, a foreign national can be in lawful status but not admitted -- think of someone who entered the country unlawfully, but then received asylum.

Id.  (emphases added).    The dissent's interpretation of § 1225(b)(2)(A) tends to conflate "admission" with "lawful status."  But as Sanchez demonstrates, these concepts are distinct, and the Supreme Court considers as "not admitted" those noncitizens who, like Guerrero Orellana, "entered the country unlawfully." Id.  That remains true even if they later gain lawful status.  Id.
[28] The dissent contends that 8 U.S.C. § 1101(a)(13)(C) casts doubt on our reading of "'seeking admission' as referring only to those 'trying to gain lawful entry into the United States'" at a "border or port of entry."   Section 1101(a)(13)(C) states: "An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States" unless one of six exceptions applies. 8 U.S.C. § 1101(a)(13)(C) (emphasis added).   The dissent argues that this provision's framing in the negative -- "shall not be regarded" -- makes "little sense" if our reading of "seeking admission" is correct because Congress would not have needed to specify "that aliens who are already admitted are not to be regarded as 'seeking an admission.'"   (First emphasis added.)   We

see it differently.  A permanent resident returning to the United States after a trip abroad would, were it not for the rule established in § 1101(a)(13)(C), be understood under our interpretation of § 1225(b)(2)(A) to be "seeking admission" because they are trying to lawfully (re)enter the country. However, the rule in § 1101(a)(13)(C) flips this on its head, instructing to "not . . . regard[]" returning permanent residents as "seeking an admission," reflecting the special privileges and protections afforded to permanent residents.  So explained, it makes sense why Congress phrased § 1101(a)(13)(C) in the negative. Next, the dissent argues that most of the six enumerated exceptions in § 1101(a)(13)(C)(i)-(vi) "have nothing to do with 'entry,'" undermining, it contends, our interpretation of "seeking admission" as something that occurs at a border or port of entry. But in fact, most of these exceptions are explicitly triggered when a permanent resident reenters the United States after a trip abroad.  Exceptions (i) and (ii), for example, are triggered by reentry after lengthy periods outside of the country.  See 8 U.S.C. § 1101(a)(13)(C)(i), (ii) (concerning "abandon[ment]" of residency and absences from the United States "in excess of 180 days").  See Katebi v. Ashcroft, 396 F.3d 463, 466 (1st Cir. 2005) (if a "resident is not returning from 'a temporary visit abroad,' [they] will be deemed to have abandoned permanent resident status"); see 8 U.S.C. § 1101(a)(20), (27)(A); 22 C.F.R. § 42.22.  Other exceptions are triggered under circumstances where the noncitizen has "departed" from the country, thus similarly invoking contexts of reentry.  See 8 U.S.C. § 1101(a)(13)(C)(iii), (iv).  And for still other exceptions that do not explicitly reference "entry," observing how they function in practice demonstrates that they, too, are triggered in just this context.  For example, exception (v) is triggered if the individual "has committed an offense identified in [§] 1182(a)(2)."  This language does not expressly reference reentering the country, but in Lau, discussed supra note 26, this exception was triggered precisely when Lau, a permanent resident, presented himself to a border officer at John F. Kennedy International Airport when reentering the United States after a trip abroad.  146 S. Ct. at 1986-87.  As the dissent rightly notes, exception (v) played out "in the context of the border and ports of entry" in Lau because those were the facts of the case.  But we have yet to find a case invoking § 1101(a)(13)(C)(v) outside of such contexts, see, e.g., de Vega v. Gonzales, 503 F.3d 45, 47-48 (1st Cir. 2007) (similarly concerning a permanent resident returning from a trip abroad), leading us to conclude that this exception, like the others, generally occurs when a permanent resident is seeking to reenter the United States at a border or

- 49 -

v.

The government's final argument centers on congressional intent. It argues that Congress's goal, in enacting IIRIRA, was to "eliminat[e] preferential treatment for aliens who enter the country unlawfully" and that its interpretation of § 1225(b)(2)(A) reflects that intent. Guerrero Orellana's interpretation of § 1225(b)(2)(A), the government contends, would require detention of noncitizens who lawfully "present themselves for inspection at the border," while "grant[ing] bond hearings to [those] who evade immigration authorities" and enter unlawfully. And that, it argues, is just the sort of "perverse incentive" that IIRIRA meant to eliminate. See Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 140 (2020).

Throughout its brief, the government repeatedly asserts that IIRIRA's goal "was to dispense with the perverse pre-1996 regime under which aliens who entered the United States unlawfully were given 'equities and privileges in immigration proceedings that [were] not available to aliens who present[ed] themselves for inspection' at the border, including the opportunity to request release on bond." ((Alterations in original) (quoting H.R. Rep. No. 104-469, pt. 1, at 225 (1996)).) The "equities and privileges"

---

port of entry, a conclusion which lends support for our straightforward reading of "seeking admission" in § 1225(b)(2)(A).

language that the government quotes comes from a Judiciary Committee report from 1996. It states:

> Comment. -- This subsection is intended to replace certain aspects of the current "entry doctrine," under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry.

H.R. Rep. No. 104-469, pt. 1, at 225. Rather than being a general statement of congressional intent behind IIRIRA writ-large, this single-sentence excerpt from a 550-page report constitutes commentary about the amendment to a particular subsection of the INA, 8 U.S.C. § 1101(a)(13), which replaced the definition of "entry" with "admission" and "admitted," as we have discussed in this opinion. Notably, this commentary states that the amendment to the definition at § 1101(a)(13) was intended to make certain changes to "immigration proceedings" but does not even mention the word "detention." And its silence about any intent to expand detention in the way the government alleges is telling.

But more telling is IIRIRA itself. Recall that through IIRIRA, Congress amended the INA to mandate detention of certain criminal noncitizens in § 1226(c). Immediately after listing the amended language for § 1226, IIRIRA went on to create a safety valve of sorts, allowing for delayed implementation of the new mandatory detention provisions at § 1226(c). See IIRIRA,

- 51 -

§ 303(b)(2), 110 Stat. at 3009-586. Specifically, if certain congressional committees provided written notification of "insufficient detention space and . . . personnel available to carry out [§ 1226(c)], as amended," IIRIRA permitted noncitizens who would have otherwise been subjected to § 1226(c)'s new mandatory detention provision to be released for up to a two-year period. See id. Congress included no such provision permitting delayed implementation of § 1225(b)(2)(A), casting serious doubt on the government's interpretation of that provision. See id. § 302, 110 Stat. at 3009-579 to 3009-584. We will explain.

Around the time of IIRIRA's enactment, the government estimated that over four million "illegal aliens [were] in the United States," see H.R. Rep. No. 104-469, pt. 1, at 111, 119, and approximately half of that population had "entered without inspection," id. at 111. In comparison, at this same time, there were just around 100,000 "criminal aliens" incarcerated in the nation's prisons and around 45,000 "criminal aliens" who were put in deportation proceedings each year. Id. at 120. Given the 8,500 existing beds in detention centers nationwide at that time, which allowed for the custody of around 100,000 noncitizens annually, id. at 123, this meant that the number of noncitizens present in the United States who had entered without inspection outpaced "detention capacity by a factor of at least twenty to one." Immigr. L. Scholars Amici Br. at 17.

In light of the massive increase in detention that the government's reading of § 1225(b)(2)(A) would require, IIRIRA's complete silence about how to address the resulting detention capacity gap tells the exact opposite story about congressional intent. After all, Congress "does not . . . hide elephants in mouseholes." Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001). Instead of gearing up to newly detain millions of noncitizens present in the United States without inspection, IIRIRA's relatively modest uptick in detention capacity to "9,000 beds" by the end of fiscal year 1997 more logically reflects Congress's efforts to scale capacity to meet the needs of a different, smaller-scale expansion of mandatory detention: the § 1226(c) provisions. See IIRIRA § 386(a), 110 Stat. at 3009-653.[29]

## III.

Our decision rests on a straightforward interpretation of the texts at § 1225(b)(2)(A), § 1226 and the other sections of IIRIRA we have analyzed. But for those still harboring doubts, we

---

[29] In addition to the arguments analyzed in detail throughout this opinion, Guerrero Orellana also argues that the government's interpretation of § 1225(b)(2)(A) violates class members' due process rights and urges us to adopt his interpretation of this provision as a matter of constitutional avoidance. The government counters that constitutional avoidance is irrelevant because the statute is unambiguous, and it maintains that, regardless, its reading of § 1225(b)(2)(A) "does not offend due process." Because we resolve this case on the statutory grounds before us, we do not decide the due process issues raised by the parties.

add this thought: thirty years of agency practice.  Over three decades, five administrations implemented the disputed statutes just as we conclude today that their texts require.  If IIRIRA's amendment to § 1225(b)(2)(A) created the largest increase in mandatory detention in this nation's history, as the government alleges, Congress, in our view, would not have sat back while the Executive branch implemented a grossly mistaken interpretation of that newly-amended provision.  The answer driven by the statutory texts is that Congress had no such understanding.  Concluding that Guerrero Orellana and his fellow class members are governed by § 1226, not § 1225(b)(2)(A), we thus **affirm**.

**-Dissenting Opinion Follows-**

DUNLAP, **Circuit Judge**, **dissenting.** This case touches on one of the central policy debates currently roiling the country -- the federal response to illegal immigration and the government's authority to detain without bail immigrants unlawfully present in the United States. The role of the judiciary, however, is not to determine policy but to interpret the law, see Soto v. United States, 605 U.S. 360, 375 (2025); Plumley v. S. Container, Inc., 303 F.3d 364, 375 (1st Cir. 2002) -- in this case, two provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). These provisions are not the model of clarity, leaving this court with the task of determining their precise interrelationship. Of course, this court is not the first, nor will it be the last, to address the abstruse interpretive question presented here; multiple courts of appeal have already confronted the question, disagreeing among each other and themselves.[30] Recognizing that many opinions have dissected the relevant provisions in exhaustive detail and that ours will not be the last word, I explain my

---

[30] See Cirrus Rojas v. Olson, No. 25-3127, 2026 WL 2198315 (7th Cir. July 30, 2026); Rodriguez Vazquez v. Bostock, No. 25-6842, 2026 WL 2196424 (9th Cir. July 30, 2026); Santillan Quiroz v. Mullin, 180 F.4th 1226 (10th Cir. 2026); Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami, 175 F.4th 1258 (11th Cir. 2026); Lopez-Campos v. Raycraft, 175 F.4th 713 (6th Cir. 2026); Cunha v. Freden, 175 F.4th 61 (2d Cir. 2026); Avila v. Bondi, 170 F.4th 1128 (8th Cir. 2026); Buenrostro-Mendez v. Bondi, 166 F.4th 494 (5th Cir. 2026); Castañon-Nava v. U.S. Dep't of Homeland Sec., 175 F.4th 828 (7th Cir. 2026).

respectful disagreement with my colleagues' thoughtful opinion as concisely as the question allows.

As the majority rightly identifies, two provisions are central to the question presented.  The first is 8 U.S.C. § 1225.  Section 1225(b)(2)(A) provides, in relevant part: "[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."    8  U.S.C.  § 1225(b)(2)(A).    Detention  under § 1225(b)(2)(a)  does  not  allow  for  release  on  bond.    Id. Section 1225 further states that "[a]n alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission."  Id. § 1225(a)(1).  The second critical provision is 8 U.S.C. § 1226.  It states that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."  Id. § 1226(a).  Section 1226 provides that release on bond or parole is available for aliens detained under that provision.  Id. § 1226(a)(2).

The key question is as follows:  Does § 1225(b)(2)(A) cover aliens illegally present within the United States?  Or only those arriving at the border and ports of entry?  The government

takes the position that § 1225(b)(2)(A) covers persons present in the United States unlawfully because § 1225(a)(1) by operation of law deems such persons to be "applicants for admission" who are necessarily "seeking admission" under § 1225(b)(2)(A).    The government thus contends that persons in the United States unlawfully can be held without bond.    Petitioner, however, argues that § 1225(b)(2)(A) only applies to those arriving in the United States because the phrase "seeking admission" requires an affirmative act by the alien to seek lawful admission to the United States at the border or at a port of entry.    Petitioner thus contends that persons unlawfully present in the United States may only be detained via § 1226, which does allow for release on bond. Although my colleagues agree with Petitioner after examining the less-than-pellucid sections of IIRIRA, I conclude that the government has the better of the argument.

## I.

The primary basis for my conclusion is the language of § 1225 itself.    See Campos-Chaves v. Garland, 602 U.S. 447, 457 (2024) ("As always, we start with the text."); Penobscot Nation v. Frey, 3 F.4th 484, 490 (1st Cir. 2021).    Section 1225(b)(2)(A) on its face applies to "an alien who is an applicant for admission," and mandates that such aliens shall be detained "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted . . . ."    8

- 57 -

U.S.C. § 1225(b)(2)(A).  In turn, § 1225(a)(1) "deem[s]" certain aliens -- those "present in the United States who [have] not been admitted" and those "who arrive[] in the United States" -- to be "applicant[s] for admission" as a matter of law.  Id. § 1225(a)(1) (emphasis added).

A deeming provision treats something as if it were something else, thereby creating a legal fiction.  Sturgeon v. Frost, 587 U.S. 28, 47 (2019).  By creating a legal fiction via § 1225(a)(1), Congress has identified a group of persons who have not affirmatively applied for anything and required that they be treated as "applicant[s] for admission" simply on the basis that they are present in the United States without having been admitted.  See Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami, 175 F.4th 1258, 1288 (11th Cir. 2026) (Lagoa, J., dissenting).  "If a person whom Congress has deemed an applicant for admission is not seeking admission, it is hard to know what Congress thought it was deeming him to be."  Id. at 1291; see Cirrus Rojas v. Olson, No. 25-3127, 2026 WL 2198315, at *19 (7th Cir. July 30, 2026) (Sykes, J., dissenting); Lopez-Campos v. Raycraft, 175 F.4th 713, 741 (6th Cir. 2026) (Murphy, J., dissenting).

Because § 1225(a)(1) is a deeming provision, the phrase "seeking admission" in § 1225(b)(2)(A) should not be read as an independent requirement or qualifier further limiting the application of that provision; it instead is consonant with the

notion that any applicant for admission -- including an alien present in the United States without admission -- is by operation of law seeking admission. See Hernandez Alvarez, 175 F.4th at 1295-96 (Lagoa, J., dissenting); Lopez-Campos, 175 F.4th at 741-42 (Murphy, J. dissenting). Indeed, if "seeking admission" were a separate requirement requiring affirmative action to obtain admission, Congress could have, as it regularly does in other contexts, made that clear by using an "is/and" construct -- "[is] seeking admission [and] is not clearly . . . entitled . . . to be admitted" -- to indicate multiple conditions in that clause. Avila v. Bondi, 170 F.4th 1128, 1134-35 (8th Cir. 2026). Congress' choice not to do so suggests that "seeking admission" is not a standalone criterion requiring aliens to be making some present, affirmative action to seek admission. Id.

Section 1225 thus establishes that aliens present in the United States without admission are "seeking admission." Hernandez Alvarez, 175 F.4th at 1288-89 (Lagoa, J., dissenting); see Lopez-Campos, 175 F.4th at 735-36 (Murphy, J., dissenting). Read together, subsections (a)(1) and (b)(2) lead to the conclusion that the government's detention authority under subsection (b)(2) is not limited to those arriving in the United States.

Petitioner, and my colleagues in the majority, would nevertheless read the "if clause" ("if the examining immigration officer determines that an alien seeking admission is not clearly

- 59 -

and beyond a doubt entitled to be admitted") to impose two separate requirements -- "one pertaining to 'seeking admission' and one pertaining to the alien's entitlement to admission," Avila, 170 F.4th at 1133-34 -- that would narrow the application of § 1225(b)(2) to those affirmatively seeking admission at the border or a port of entry. This reading is flawed.

While giving lip service to fact that § 1225(b)(1) is a deeming provision, the majority's analysis assumes as a given the premise -- incorrect, in my view -- that we are engaged primarily in a definitional exercise, parsing the words "seeking" and "admission" to determine whether an alien already in the country can be viewed as trying to gain lawful entry after inspection and authorization. This analysis is beside the point because § 1225(a)(1) expressly creates a legal fiction, deeming a person to be an applicant for admission who would not otherwise be considered an applicant seeking admission. See Cirrus Rojas, 2026 WL 2198315, at *20-21 (Sykes, J., dissenting). The majority's analysis nullifies the "shall be deemed" language of the statute. 8 U.S.C. § 1225(a)(1); see Sturgeon, 587 U.S. at 47. Even though Congress did not define "what 'applicants for admission' means," it did tell "us what unadmitted aliens, like Petitioner, are to be treated as." Hernandez Alvarez, 175 F.4th at 1289 (Lagoa, J., dissenting). Stated another way, we need not decide as a matter of first impression whether Petitioner fits within certain

- 60 -

parameters because the statute instructs us to treat him as though he does.[31]

The majority asserts that my treatment of the deeming clause as a deeming clause "violates the applicable rules of statutory construction the Supreme Court mandates lower courts must follow." If such a rule, demanding that deeming clauses be functionally treated as definitional in nature, exists, I am unaware of any Supreme Court authority to that point; the majority surely has not identified it. Indeed, the majority then curiously notes, in a footnote, that they "need not decide" whether

---

[31] Even accepting for the sake of argument that we are engaged in a definitional exercise rather than giving effect to a deeming provision, the statutory context casts some doubt on the majority's interpretation of "seeking admission" as referring only to those "trying to gain lawful entry into the United States after inspection and authorization by an immigration officer" at the border or a port of entry. In § 1101(a)(13)(C), Congress specified that "[a]n alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless" the alien satisfies any one of six enumerated subsections. 8 U.S.C. § 1101(a)(13)(C) (emphasis added). If "seeking admission" were as limited as the majority posits, this provision would make little sense. First, there would be no reason for Congress to frame the provision in the negative; Congress would have had no need to say that aliens who are already admitted are not to be regarded as "seeking an admission" -- it would be self-evident that admitted legal permanent residents are not "seeking" "lawful entry." Second, the provision articulates several ways in which admitted legal permanent residents can be considered as "seeking an admission," most of which have nothing to do with "entry," see id. § 1101(a)(13)(C)(i)-(v), and the final of which expressly applies to those entering "without" inspection and authorization, id. § 1101(a)(13)(C)(vi). See Lopez-Campos, 175 F.4th at 752 (Murphy, J., dissenting). I do not think the definitional exercise engaged in by the majority is as cut and dried as my colleagues assert.

§ 1225(a)(1) is, in fact, a "deeming provision," rather than a "definitional provision."  I would prefer to take the statutory language at face value.[32]

The majority further asserts that my reasoning requires a logical leap because it links "deeming" certain persons to be applicants for admission with the conclusion that those persons are also thereby "seeking admission."  But my colleagues offer no other explanation for the deeming provision.  The question here is whether the legal fiction created by § 1225(a)(1) "carries consequences, or whether it is a label and nothing more."  Hernandez Alvarez, 175 F.4th at 1288 (Lagoa, J., dissenting).  By my read, the answer is simple: to give meaning to the deeming

---

[32] To be clear, § 1225(a)(1) does not simply define "applicant for admission" as it is used in the statute.  See Hernandez Alvarez, 175 F.4th at 1287-88 (Lagoa, J., dissenting).  If Congress wanted to define "applicant for admission," it could have done so by foregoing the term "deemed" and instead stating that an applicant for admission "means" an alien in the United States who has not been admitted or who arrives in the United States.  The definitional subsections invoked by the majority prove this point.  Section 1101(a)(13)(A), for example, says that the terms "admission" and "admitted" "mean . . . the lawful entry of the alien into the United States after inspection and authorization . . . ."  (emphasis added).  Likewise, § 1101(a)(18) says that "[t]he term 'immigration officer' means any employee . . . designated by the Attorney General . . . to perform the functions of an immigration officer specified by this chapter or any section of this title."  (emphasis added).  Congress is capable of telling us when it intends to define terms versus when it intends to create legal fictions.  Similarly, the majority invokes, in support of its conclusion, various statutory titles.  To the extent that the majority grants statutory titles persuasive weight, I note that § 1225(a)(1) is titled "Aliens treated as applicants for admission."  (emphasis added).

clause is to attach to it the consequences attendant.  Nor am I convinced that, under Sturgeon, the statute must expressly state the consequences of the deeming language to read it as I do.  In the words of the Supreme Court, "[t]he key word here is 'deemed.'"  Sturgeon, 587 U.S. at 47.  As Judge Lagoa has thoroughly explained, "even on its most sympathetic reading, the deeming clause in Sturgeon did not displace the ordinary meaning of the deemed category."  Hernandez Alvarez, 175 F.4th at 1289 (Lagoa, J., dissenting).

But what about the surplusage canon?  Both Petitioner and the majority contend that the government's construction renders the words "seeking admission" superfluous.  I agree with my colleagues that the surplusage canon is an important guiding principle; but, as my colleagues also rightly acknowledge, the "anti-surplusage canon is not an iron rule."  Mullin v. Al Otro Lado, 146 S.Ct. 2079, 2092 (2026); see A. Scalia & B. Garner, Reading Law 176-77 (2012).  As the Supreme Court has observed in the context of immigration laws, the existence of redundancy is unfortunately common.  See Pugin v. Garland, 599 U.S. 600, 609 (2023).  Here, where the deeming provision expressly collapses the distinction between those aliens present without admission within the United States and those arriving in the United States, the "statutory context . . . rebut[s] the idea that each" phrase within the statute "must have wholly independent meaning."  Al

- 63 -

Otro Lado, 146 S.Ct. at 2093.  The term "alien seeking admission" simply appears to be a (rather inartful) reference back to the term "applicant for admission."  See Avila, 170 F.4th at 1135; Buenrostro-Mendez v. Bondi, 166 F.4th 494, 503 (5th Cir. 2026); Hernandez Alvarez, 175 F.4th at 1295-96 (Lagoa, J., dissenting); Castañon-Nava v. U.S. Dep't of Homeland Sec., 175 F.4th 828, 872-73 (7th Cir. 2026) (Kirsch, J., dissenting).

In any event, the surplusage canon raises a larger problem for Petitioner, given the intentional breadth of the deeming provision in § 1225(a)(1).  A statute must generally be construed to give effect to every provision.  Corley v. United States, 556 U.S. 303, 314 (2009). Petitioner, however, effectively reads a substantial portion of subsection (a)(1) out of the statute.  Buenrostro-Mendez, 166 F.4th at 504; Hernandez Alvarez, 175 F.4th at 1296-97 (Lagoa, J., dissenting).  According to Petitioner's argument, Congress broadly deemed all "alien[s] present in the United States who ha[ve] not been admitted" to be "applicant[s] for admission," 8 U.S.C. § 1225(a)(1), but thereafter qualified the term "applicant for admission" throughout § 1225 such that the provision only applies to those who "arrive[] in the United States," id.; see Hernandez Alvarez, 175 F.4th at 1296-97 (Lagoa, J., dissenting).[33]  But § 1225(a)(1) was not

---

[33] The majority argues that the deeming clause retains its full meaning in ancillary provisions in different sections of the

limited to aliens who arrive in the United States. 8 U.S.C. § 1225(a)(1). We should not adopt a reading that renders much of the deeming provision in § 1225(a)(1) a dead letter. Buenrostro-Mendez, 166 F.4th at 504; see Hernandez Alvarez, 175 F.4th at 1296-97 (Lagoa, J., dissenting). "[R]edundancy in a single sentence is a minor interpretive cost. Nullifying the reach of a deeming provision across an entire statutory section is not." Hernandez Alvarez, 175 F.4th at 1297 (Lagoa, J., dissenting).

Petitioner's reading of § 1225 also gives rise to a related problem -- Congress' decision not to use a narrow term ("arriving aliens") it frequently used elsewhere when it intended a narrower reading. See Dep't of Homeland Sec. v. MacLean, 574 U.S. 383, 391 (2015) ("Congress generally acts intentionally when

INA, such as § 1229a(c)(2). But narrowing the deeming provision's relevance to these provisions would be an illogical outcome. See Buenrostro-Mendez, 166 F.4th at 504 n.10. "[I]t is a bizarre construction to suggest that Congress established a broad definition in § 1225 but, despite repeatedly using the term in § 1225, used the full breadth of the definition only in a corollary provision in a completely independent section of the code." Id. The majority further suggests that the provision would retain meaning in § 1225 by virtue of its use in § 1225(a)(3) -- but that reading, otherwise convenient to the majority, simply undermines their broader point. Section 1225(a)(3) requires applicants for admission (including, the majority says, persons present in the United States) to be inspected by immigration officers; but elsewhere, to escape the implications of § 1225(a)(5) using the terms "applicants for admission" and "seeking admission" apparently interchangeably, the majority argues that any inspection by immigration officers occurs at the border. In any event, it seems to be less than a natural reading for § 1225(a)(1) to define "applicant for admission" so broadly simply for purposes of one sub-provision.

it uses particular language in one section of a statute but omits it in another."); Penobscot Nation, 3 F.4th at 505.    If § 1225(b)(2)(A) were limited to arriving aliens, as Petitioner argues, then Congress could have used the phrase "arriving alien," as it frequently did where that limitation was intended. Buenrostro-Mendez, 166 F.4th at 504 (citing 8 U.S.C. §§ 1225(a)(2), (c)(1), (d)(2)); Lopez-Campos, 175 F.4th at 752-53 (Murphy, J., dissenting) ("In nearly every other context, when Congress sought to limit a provision's reach to those arriving at the border, it used a phrase like 'arriving in the United States.'"); Castañon-Nava, 175 F.4th at 875 (Kirsch, J., dissenting).    Congress' choice to adopt a broad deeming provision, and to forego using the specific term "arriving alien," indicates that it did not so limit § 1225(b)(2)(a).

## II.

Looking to context, related provisions support this interpretation of the statute.    See Yates v. United States, 574 U.S. 528, 537 (2015) ("[S]tatutory language is determined not only by reference to the language itself, but as well by the specific context in which that language is used, and the broader context of the statute as a whole."    (citation modified)); Penobscot Nation, 3 F.4th at 504-05.    Viewing § 1225 alongside § 1226 -- the provision primarily relied upon by Petitioner -- the statutory scheme as a whole reinforces my conclusion.

I look first to § 1225(a)(3), which specifies that "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers."  8 U.S.C. § 1225(a)(3) (emphasis added).  This language strongly suggests that applicants for admission are deemed to be seeking admission. The word "otherwise" is a catch-all identifying that the items preceding it are subsumed by what comes after -- that is, it indicates a sub-set/super-set relationship.  Hernandez Alvarez, 175 F.4th at 1292 (Lagoa, J., dissenting).  If "otherwise" is read to mean simply "something that is different from something already mentioned," rather than to indicate a sub-set/super-set relationship, it would effectively read that word out of the statute: the same reading would be accomplished if the statute simply read "who are applicants for admission or seeking admission."  See Buenrostro-Mendez, 166 F.4th at 503-504.[34]  The natural reading of "otherwise" is the most persuasive one.  See Lopez-Campos, 175 F.4th at 747-48 (Murphy, J., dissenting);

---

[34] Indeed, where Congress uses the term "or otherwise" in the very same subsection that it twice uses the term "or," the former must mean something different from the latter.  8 U.S.C. § 1225(a)(3) ("who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States . . ." (emphases added)); A. Scalia & B. Garner, Reading Law 170-171 (2012) (explaining that different terms typically carry different meanings).

Hernandez Alvarez, 175 F.4th at 1292-93 (Lagoa, J., dissenting); Castañon-Nava, 175 F.4th at 874 (Kirsch, J., dissenting).

I am not persuaded that Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc., 586 U.S. 123 (2019), compels a different conclusion. See Lopez-Campos, 175 F.4th at 749-50 (Murphy, J., dissenting). Helsinn is a case about reenactment, not about the best reading of "or otherwise." Hernandez Alvarez, 175 F.4th at 1293. Helsinn simply concluded that the addition of the word "otherwise" by amendment to a long-standing statutory term did not narrow a term the Supreme Court had previously interpreted. 586 U.S. at 131-32. By contrast, when Congress passed IIRIRA in 1996, Congress completely overhauled § 1225, including by introducing and defining a new statutory term "applicant for admission." Unlike in Helsinn, the "or otherwise" clause of § 1225(a)(3) was not merely tagged on to "the exact language used in its predecessor statute . . . ." Id. at 131. Helsinn does not change the conclusion that, given its best reading, "[t]he use of 'or otherwise' suggests that 'applicants for admission' are a subset of those seeking admission." Buenrostro-Mendez, 166 F.4th at 503.[35]

---

[35] The majority's parole illustration does not prove otherwise. It does not follow that, simply because parole is not the equivalent of admission, parolees are only "applicant[s] for admission" and are not also seeking admission. Receiving advance parole is not incompatible with seeking admission. Section 1182 expressly states that parole can be offered to "any alien applying

Section 1225(a)(5), which provides that "[a]n applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States," 8 U.S.C. § 1225(a)(5) (emphasis added), leads to the same conclusion.  It, too, "strongly suggests that those who are applicants for admission are 'seeking admission,'" Buenrostro-Mendez, 166 F.4th at 503, because "Congress did not treat 'seeking admission' as a separate condition the applicant may or may not satisfy" but instead "presupposed the connection," Hernandez Alvarez, 175 F.4th at 1294 (Lagoa, J., dissenting).  The majority rejects this reading because the provision refers to an immigration officer (suggesting that it applies only to the border and ports of entry) and uses the permissive word "may."  But immigration officers can ask unlawfully present aliens these questions as well, id.; see 8 U.S.C. § 1225(a)(3), and the use of the word "may" means only that the questions are not mandatory,

_____

for admission to the United States."  8 U.S.C. § 1182(d)(5)(A); see also 8 C.F.R. § 212.5(c).  An alien's entry under parole is not in lieu of admission, but is instead a temporary approval to enter the country.  The code confirms this understanding: after a term of parole concludes, a parolee then "shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A).  Parole simply allows certain aliens who are seeking admission to be released into the United States.  Because parolees are not excluded from the category of those "seeking admission," "applicant for admission" does not necessarily encompass persons not "seeking admission."

- 69 -

not that they are applicable only in certain contexts, Lopez-Campos, 175 F.4th at 750-51 (Murphy, J., dissenting).

The government's reading finds further support in § 1182(a)(9)(B)(i)(I), which provides that any alien "who . . . was unlawfully present in the United States for a period of more than 180 days but less than 1 year, voluntarily departed the United States . . . and again seeks admission within 3 years of the date of such alien's departure or removal" is inadmissible. 8 U.S.C. § 1182(a)(9)(B)(i)(I).  (emphasis added).  The use of the word "again" indicates that those who have been unlawfully present in the United States are deemed to have sought admission -- whether or not they took any affirmative action to do so.  Lopez-Campos, 175 F.4th at 752 (Murphy, J., dissenting).  "[T]he word 'again' in this provision would serve no purpose unless the prior unlawful presence itself qualified as the first time that the immigrant was 'seeking admission.'"  Id.

Petitioner points to § 1226, which -- as noted above -- provides that, "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States," with release on bond or conditional parole generally available (subject to some limitations to which I will turn momentarily).  8 U.S.C. § 1226(a).  On its face, § 1226 applies to Petitioner here, because he is an "alien."  Petitioner suggests that, because § 1226

- 70 -

can apply, § 1225 must be construed to avoid any overlap.  I am not persuaded by Petitioner's effort to limit § 1225's application.  First, it is well established that courts "give effect to two statutes that overlap, so long as each reaches some distinct cases."  J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc., 534 U.S. 124, 144 (2001); see Bruno Proj. Rescue Inc. v. CDC, No. 25-1801, 2026 WL 2017744, at *6 (1st Cir. July 13, 2026).  In this case, both statutes can be given effect under the government's reading.  "Section 1226(a) undeniably does work independent from § 1225(b)(2)(a) because only § 1226(a) applies to admitted aliens who overstay their visas, become deportable on many different grounds, or were admitted erroneously due to fraud or some other error."  Buenrostro-Mendez, 166 F.4th at 504-05; see Hernandez Alvarez, 175 F.4th at 1297 (Lagoa, J., dissenting).  Second, because the two provisions overlap but reach distinct cases, the more specific -- here, § 1225 -- controls and the general "must be taken to affect only such cases within its general language as are not within the provisions of the particular . . . ."  RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 646 (2012) (quoting United States v. Chase, 135 U.S. 255, 260 (1890)).

Both the majority and Petitioner rely specifically on § 1226(c), which specifies that certain aliens are ineligible for bond, arguing that there would be no need for Congress to have

specified that certain aliens unlawfully present in the United States are ineligible for bond under § 1226(c) if those aliens are already subject to mandatory detention under § 1225(b)(2)(a). This argument is not as persuasive as they contend; some of the exclusions apply to individuals arriving in the United States, see, e.g., 8 U.S.C. § 1226(c)(1)(A), (D), and thus would overlap with § 1225 even under Petitioner's reading.   In any event, § 1226(c) is not rendered irrelevant by the government's reading. "Not only does § 1226(c) sweep in deportable aliens in addition to the inadmissible aliens covered by § 1225(b)(2)(A), see 8 U.S.C. § 1226(c)(1)(B)-(C), it also eliminates the option of parole for those to whom it applies." Buenrostro-Mendez, 166 F.4th at 505; see Hernandez Alvarez, 175 F.4th at 1297 (Lagoa, J., dissenting). Again, therefore, the two provisions overlap but serve distinct purposes -- which is permissible, and not even necessarily uncommon.  See RadLAX Gateway Hotel, LLC, 566 U.S. at 645-46.

As to the amendments to § 1226(c) from the Laken Riley Act specifically, it is noteworthy that those amendments were adopted "at a time when the Executive was still declining to exercise its full enforcement authority under the INA," and therefore had direct and immediate effect by requiring "the detention without bond or parole of certain aliens the administration was then treating as bond-eligible." Buenrostro-Mendez, 166 F.4th at 505; see Hernandez Alvarez, 175

F.4th at 1297 (Lagoa, J., dissenting).  The majority dismisses this point because the government does not cite any evidence of Congress' intent, and posits that Congress could have addressed such a problem via different means.  My point, however, is a limited one: Regardless of Congress' intent, there is no reasonable dispute that the Laken Riley Act had the effect I have described; this is enough to give the amendments to § 1226(c) meaning.  And the fact that Congress could have chosen to amend some other provision to accomplish the same goal proves nothing; Congress has the right to achieve a result by one of any multitude of paths, not just one.  See Wagner v. Fed. Election Comm'n, 717 F.3d 1007, 1012 (D.C. Cir. 2013).

### III.

I turn finally to two additional considerations, namely, pertinent Supreme Court precedent and congressional intent.  Neither leads me to reject the government's position.

First, the Supreme Court's discussions of §§ 1225 and 1226 do not compel acceptance of Petitioner's reading.  The majority cites Nielsen v. Preap, 586 U.S. 392, 409 (2019), for the proposition that § 1226(c) is not a source of detention authority but rather derives from § 1226(a); thus, the argument goes, the government must concede that § 1226(a) applies if it also argues that the elimination of parole applies under § 1226(c).  But Preap simply reinforces the point, already made, that §§ 1225 and 1226

overlap; it does not suggest that § 1225 is inapplicable. Buenrostro-Mendez, 166 F.4th at 505 n.12. The majority also cites Jennings v. Rodriguez, noting that Jennings observes that § 1225 applies to "certain aliens seeking admission into the country" and § 1226 applies to "certain aliens already in the country." 583 U.S. 281, 289 (2018). So much is true; but, like Preap, Jennings does not compel the conclusion that § 1225(b)(2)(A) and § 1226 are mutually exclusive. As an initial matter, the language in Jennings is drawn from the court's background discussion, rather than the Court's analysis. See Buenrostro-Mendez, 166 F.4th at 505-06. In any event, Jennings' dicta -- to the extent it reflects any legal reasoning -- is not as clear as Petitioner and the majority suggest. "While Jennings states that § 1226 generally authorizes the Government to detain 'certain aliens already in the country,' this does not preclude other statutory provisions -- such as § 1225(b)(2)(A) -- from also applying to such aliens." Avila, 170 F.4th at 1136 (quoting Jennings, 583 U.S. at 289) (citations omitted). And Jennings also stated that "§ 1225(b) applies primarily to aliens seeking entry into the United States ('applicants for admission' in the language of the statute)." 583 U.S. at 297. This language cuts against Petitioner and the majority, as it equates "seeking entry" with "applicants for admission." Buenrostro-Mendez, 166 F.4th at 506; Hernandez

Alvarez, 175 F.4th at 1298 (Lagoa, J., dissenting).  The Supreme Court has not answered the question before us.[36]

Second, and finally, I do not find the parties' competing arguments regarding legislative intent particularly enlightening. See Conroy v. Aniskoff, 507 U.S. 511, 519 (1993) (Scalia, J., concurring in the judgment). Many of the arguments are in counterpoise:  "The government and Petitioner offer directly contradictory excerpts from the legislative record." Hernandez Alvarez, 175 F.4th at 1299 (Lagoa, J., dissenting).  Other arguments are simply speculative.  I give one example: Petitioner emphasized -- and the majority agrees -- that it would make no sense for Congress to delay implementation of the provision requiring mandatory detention for aliens who are inadmissible or

---

[36] The majority's reliance on other Supreme Court cases is likewise of no avail.  The majority invokes Sanchez v. Mayorkas, 593 U.S. 409 (2021), for the proposition that "admission" and "lawful status" are "distinct concepts." Id. at 415.  I do not disagree that these concepts are distinct; I simply follow Congress' directive in § 1225(a)(1) to treat aliens present in the United States without admission as "applicants for admission." Finally, I put no weight on the fact that the Supreme Court's discussion of "seeking admission" in Mullin v. Al Otro Lado, 146 S.Ct. 2079 (2026), and Blanche v. Lau, 146 S.Ct. 1981 (2026), occurred in the context of the border and ports of entry.  That is not at all surprising, because the facts of the cases involved the border and ports of entry.  Al Otro Lado, 146 S.Ct. at 2087, 2091; Lau, 146 S.Ct. at 1985-87.  The majority substantially overreads those cases; the Supreme Court did not say or imply in either case that the application of § 1225 in this context excludes its application in other contexts.  To the contrary, in Lau, the Supreme Court appeared to use the terms "applicant for admission" and "seeking an admission" interchangeably, 146 S.Ct. at 1987-88, further undermining the majority's conclusion.

deportable on criminal grounds under § 1226(c) because of the purported need to increase detention facilities, but to not delay implementation of a broader detention policy under § 1225(b)(2)(A). But there are various reasons Congress may have made this determination. See Avila, 170 F.4th at 1137-38; Buenrostro-Mendez, 166 F.4th at 507-08. For example, aliens who satisfy the criminal grounds for mandatory detention and are subject to removal proceedings are often incarcerated, so they are comparatively easy to identify and remove; thus, a surge in demand for detention space could readily be anticipated. On the other hand, in the absence of strong, on-the-streets immigration enforcement in the 1990s, Congress may have had little reason to expect that there would be a similarly dramatic increase in the number of immigrants without criminal records requiring detention. In fact, in 1995, approximately two-thirds of the aliens who were removed had committed crimes. See 1996 Statistical Yearbook of the Immigration and Naturalization Service, U.S. Dep't of Just., at 171.[37] Because the number of aliens deported in 1995 in the absence of a preceding criminal detention was less than those expected to be deported after a criminal detention, id; see H.R. Rep. No. 104-469, pt. 1 at 118-120, 123 (1996), Congress' choice

---

[37]    Available at the following website: https://ohss.dhs.gov/sites/default/files/2023-12/ins_yearbook_immigration_statistics_1996.pdf [https://perma.cc/HX72-W7MG].

not to delay enforcement may have been altogether logical.  The point is, we cannot divine Congress' expectations.  Speculation as to Congress' choice is not a sound basis for reaching a conclusion contrary to the best reading of the statute.  See Garland v. Cargill, 602 U.S. 406, 428 (2024); Penobscot Nation v. Mills, 861 F.3d 324, 335 (1st Cir. 2017) (citing Henson v. Santander Consumer USA Inc., 582 U.S. 79, 89 (2017)), withdrawn by 954 F.3d 453 (1st Cir. 2020) and aff'd en banc by 3 F.4th 484 (1st Cir 2021).

## IV.

Much more could be said but no more need be said to explain the fundamental basis for my conclusion that my worthy colleagues have not reached the best possible reading of the relevant statutory provisions.  I share Judge Sykes' view that little is to be gained by rehashing the arguments further; the debate -- now well refined -- will doubtless be resolved by the Supreme Court.  Cirrus Rojas, 2026 WL 2198315, at *21 (Sykes, J., dissenting).  I respectfully dissent.